UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ORBIT ONE COMMUNICATIONS, INC., and DAVID RONSEN,<br><br>                                        Plaintiffs,<br><br>        - against -<br><br>NUMEREX CORP.,<br><br>                            Defendant. | 08-CV-0905 (LAK) (JCF) |
| NUMEREX CORP.,<br><br>                                        Plaintiff,<br><br>         -against<br><br>SCOTT ROSENZWEIG and GARY NADEN,<br><br>                                Defendants. | 08-CV-6233 (LAK) (JCF) |

## DECLARATION OF BRANDON H. COWART IN SUPPORT OF NUMEREX CORP.'S MOTION FOR RETURN OF STOLEN DOCUMENTS AND SANCTIONS

Brandon H. Cowart declares under penalty of perjury:

1.      I am an associate of the law firm of Arnold & Porter LLP, counsel for Numerex Corp. in the above-captioned actions. I submit this declaration in support of Numerex Corp.'s Motion for Return of Stolen Documents and Sanctions.

2.      On May 29, 2008, I telephoned plaintiffs' counsel, John McFerrin-Clancy, regarding the May 30 conference call scheduled with the Court. The purpose of my call was to discuss whether, during the May 30 conference call, plaintiffs intended to move for a protective order regarding documents over which they asserted a privilege claim. This call was made in light of my May 16 letter to Mr. McFerrin-Clancy – in which I

stated that Numerex would begin reviewing the allegedly privileged documents after May 30 unless plaintiffs moved for a protective order. *See* Exhibit 17 (attached hereto). On May 29, I left a voicemail message for Mr. McFerrin-Clancy asking if plaintiffs intended to so move at the conference call.

3.       The Numerex Satellite Division server is backed-up by twelve computer disks, one disk being used per day. These disks are rotated daily, meaning that data removed from the server would be preserved for twelve days until that back-up disk is reused. Once plaintiffs filed their lawsuit in January 2008, Numerex removed from rotation these twelve back-up disks and purchased new disks for use in the back-up system. *See* Exhibit 10 (attached hereto).

4.       Attached hereto as Exhibit 1 is a true and correct copy of the cover page, pages 1-2, page 33, and the signature page, of the Asset Purchase Agreement by and between Orbit One Communications, LLC, and Orbit One Communications, Inc., dated July 31, 2007.

5.       Attached hereto as Exhibit 2 is a true and correct copy of pages 1-4, and the signature page, from the Severance and Non-Competition Agreement between Numerex Corp. and David Ronsen.

6.       Attached hereto as Exhibit 3 is a true and correct copy of Schedule 1.1(b) of the Asset Purchase Agreement, setting forth "Excluded Assets" as referenced in section 1.1(b) of the Asset Purchase Agreement.

7.       Attached hereto as Exhibit 4 is a true and correct copy of Exhibit D1 of the Severance and Non-Competition Agreement, the "Intellectual Property and Confidentiality Agreement," between Numerex Corp. and David Ronsen.

2

8.      Attached hereto as Exhibit 5 is a true and correct copy of pages 1, 8, 21-23, and 30-33 from the Numerex Associate Handbook, dated May 2007.

9.      Attached hereto as Exhibit 6 is a true and correct copy of the Receipt of Numerex Associate Handbook, signed by David Ronsen, dated August 1, 2007.

10.     Attached hereto as Exhibit 7 is a true and correct copy of an August 4, 2008 letter from Plaintiff David Ronsen's counsel, Matthew Savare, to counsel for Numerex, Kent Yalowitz.

11.     Attached hereto as Exhibit 8 is a true and correct copy of a letter dated August 5, 2008 from Kent Yalowitz, to counsel for David Ronsen, John-McFerrin-Clancy.

12.     Attached hereto as Exhibit 9 is a true and correct copy of an August 8, 2008 letter from Kent Yalowitz to Matthew Savare.

13.     Attached hereto as Exhibit 10 is a true and correct copy of a January 30, 2008 email from counsel for Numerex, Brandon Cowart, to John McFerrin-Clancy.

14.     Attached hereto as Exhibit 11 is a true and correct copy of a February 19, 2008 email exchange between Brandon Cowart to Matthew Savare.

15.     Attached hereto as Exhibit 12 is a true and correct copy of a February 5, 2008 e-mail from John McFerrin-Clancy to Brandon Cowart.

16.     Attached hereto as Exhibit 13 is a true and correct copy of email correspondence dated February 19, 2008 and March 11, 2008 between Brandon Cowart and Matthew Savare.

17.     Attached hereto as Exhibit 14 is a true and correct copy of an April 1, 2008 letter from Kent Yalowitz to John McFerrin-Clancy.

18.     Attached hereto as Exhibit 15 is a true and correct copy of an April 16, 2008 letter from Kent Yalowitz to John McFerrin-Clancy.

19.     Attached hereto as Exhibit 16 is a true and correct copy of an April 28, 2008 letter from John McFerrin-Clancy to Kent Yalowitz.

20.     Attached hereto as Exhibit 17 is a true and correct copy of a May 16, 2008 letter from Brandon Cowart to John McFerrin-Clancy.

21.     Attached hereto as Exhibit 18 is a true and correct copy of a May 27, 2008 email from Brandon Cowart to John McFerrin-Clancy and Matthew Savare.

22.     Attached hereto as Exhibit 19 is a true and correct copy of email correspondence dated June 4 and 9, 2008, between Kent Yalowitz and John McFerrin-Clancy.

23.     Attached hereto as Exhibit 20 is a true and correct copy of an August 6, 2008 letter from Matthew Savare to Kent Yalowitz.

24.     Attached hereto as Exhibit 21 is a true and correct copy of an August 13, 2008 letter from John McFerrin-Clancy to Kent Yalowitz.

25.     I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, NY
        August 27, 2008.


_B Cowart_
_____
BRANDON H. COWART

1

# ASSET PURCHASE AGREEMENT

By and Between

**ORBIT ONE COMMUNICATIONS, LLC**

and

**ORBIT ONE COMMUNICATIONS, INC.**

Dated as of July 31, 2007

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is entered into as of the 31st day of July 2007, by and between Orbit One Communications, LLC, a Georgia limited liability company ("**Buyer**"), Orbit One Communication, Inc., a Montana corporation (**"Seller'**) and Numerex Corp., a Pennsylvania corporation ("NMRX") as guarantor of Buyer's obligations under this Agreement.

WHEREAS, Seller is in the business of: (1) providing satellite and cellular GPS equipment tracking solutions to DHS – FEMA, the American Red Cross and numerous federal and state government agencies and private organizations; (2) sale and rental of VSAT solutions; and (3) deploying proprietary field logistic software for remote asset management, GPS tracking, mapping, display, reporting and data forwarding to meet customer needs (the "**Business**");

WHEREAS, Buyer is a newly formed limited liability company which is wholly owned by NMRX;

WHEREAS, Seller desires to sell to Buyer and Buyer desires to purchase from Seller, on the terms and conditions hereinafter set forth, all the assets, properties and rights of Seller used in the Business (the "**Transaction**");

Now, therefore, in consideration of the mutual agreements, representations, warranties and covenants set forth below, Buyer and Seller agree as follows:

## ARTICLE I - PURCHASE AND SALE

**1.1    Purchase/Sale.** Except as otherwise specifically provided in Section 1.1(b), Seller hereby grants, sells, conveys, assigns, transfers and delivers to Buyer all right, title and interest of Seller in and to (a) the Business as a going concern, and (b) all of the assets, properties and rights of Seller, of every kind and description, real, personal and mixed, tangible and intangible, wherever situated, that are used in the Business (which Business, assets, properties and rights are herein sometimes called the "**Assets**"), free and clear of all mortgages, liens, pledges, security interests, charges, claims, restrictions and encumbrances of any nature whatsoever (**"Liens"**) except for Permitted Liens and Liens created by or through Buyer.

(a)    Included Assets.  The Assets include without limitation all of the assets, properties and rights of Seller used in the Business, except as otherwise expressly set forth in Section 1.1(b) hereof:

(i)    all computer software and hardware, including without limitation, the hardware and software set forth on Schedule 1.1(a);

(ii)    all technologies, methods, formulations, data bases, trade secrets, know-how, inventions and other intellectual property used or under development for use

in the Business including, without limitation, any proprietary software developed by Seller used in the operation of the Business;

(iii)    all rights under any binding agreements, leases, including without limitation Real Property (as defined below), plans, licenses, certificates used or held for use in the Business, including those set forth on Schedule 3.17;

(iv)    all rights under any patent, trademark, service mark, trade name or copyright, whether registered or unregistered, and any applications and registrations therefore, including without limitation, those set forth on Schedule 1.1(a);

(v)    all prepaid items, amounts received from customers for future services, customer deposits, unbilled costs and fees, including without limitation, those set forth on Schedule 1.1(a)(vi);

(vi)    all rights or choses in action arising out of occurrences before or after the Closing, including without limitation all rights arising under any Contract (as defined below) or under express or implied warranties relating to any of the Assets;

(vii)    all other assets, including cash (subject to adjustment as set forth in Section 1.4), accounts receivable, inventory, and assets reflected on the Most Recent Balance Sheet (as defined below) and listed on Schedule 1.1(a);

(viii)    all rights in toll free and other telephone numbers;

(ix)    all websites and e-mail addresses;

(x)    all information, files, records, data, plans, price lists, operations manuals, contracts and recorded knowledge, including customer, supplier, vendor, and subcontractor lists, related to any of the foregoing; and

(xi)    all other assets used in the Business.

(b)    Excluded Assets.  Notwithstanding the foregoing, the Assets do not include and Seller retains right, title and interest in and to the assets, properties or rights of Seller set forth on Schedule 1.1(b) (the "Excluded Assets").

1.2    Agreement to Purchase.  Buyer hereby purchases the Assets from Seller, upon and subject to the terms and conditions of this Agreement and in reliance on the representations, warranties and covenants of Seller contained herein, in exchange for the Purchase Price (as defined herein).  In addition, Buyer hereby assumes and agrees to pay, discharge or perform, as appropriate, certain liabilities and obligations of Seller only to the extent and as provided in Section 1.5 of this Agreement.  EXCEPT AS SPECIFICALLY PROVIDED IN SECTION 1.5, BUYER DOES NOT ASSUME OR BECOME RESPONSIBLE FOR ANY LIABILITIES OR OBLIGATIONS OF THE BUSINESS OR SELLER.

assignment, or other disposition of all or substantially all of the assets of Buyer or (iv) the sale, assignment or other disposition of all or substantially all of the assets of the Satellite Division after the Closing.

"**Material Adverse Effect**" means a material adverse effect (i) on the business, financial condition or results of operations of the Business, or (ii) on the ability of Seller to consummate the Transaction contemplated hereby and by the Related Documents (a "Material Adverse Effect"); provided that, for all purposes of this Agreement, none of the following shall be deemed, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a "Material Adverse Effect"; (A) any change or disruption relating to United States or foreign economies in general and (B) any change in legal or regulatory conditions (including changes in the tax law or interpretation thereof).

"**Permitted Liens**" means (i) such Liens as are set forth in <u>Schedule 1.1</u> (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business, (iii) Liens for Taxes that are not yet due and payable and (iv) in the case of real property, easements, covenants, rights-of-way and other similar restrictions of record that do not effect use and enjoyment of the property or impair marketability.

"**Satellite Division**" shall mean the subsidiary or division of Numerex that conducts the Business after the Closing.

[**Remainder of Page Intentionally Blank; Signature Page Follows**]

EXECUTED as of the date first above written by duly authorized officers of the parties hereto, intending to be legally bound hereby.

BUYER:

ORBIT ONE COMMUNICATIONS, LLC

By:
Name:
Title:

SELLER:

ORBIT ONE COMMUNICATIONS, INC.

By:
Name: David Ronsen
Title: President

NUMEREX CORP., as guarantor of the obligations of Buyer

By:
Name:
Title:

STOCKHOLDERS solely with regard to Section 2.2(a)(iv) and Section 4(f)

DAVID RONSEN

7-31-2007
SCOTT ROSENZWEIG

7-31-07
GARY NADEN

**2**

**EXHIBIT D**

## SEVERANCE AND NON-COMPETITION AGREEMENT

This Agreement is entered into effective as of the 31 day of June 2007 (the "Effective Date"), between **NUMEREX CORP.** ("NMRX") and **DAVID RONSEN**, a resident of Montana ("Mr. Ronsen").

WHEREAS, Orbit One Communications LLC ("Orbit One") and NMRX have entered into an Asset Purchase Agreement, dated the date hereof (the "Asset Purchase Agreement"), providing for the purchase by Orbit One of substantially all of the assets of Orbit One Communications, Inc. ("OOC, Inc.");

WHEREAS, NMRX is hiring Mr. Ronsen, under the terms and conditions of employment set forth below;

WHEREAS, the parties wish to document their understanding in the event that Mr. Ronsen is separated from NMRX.

THEREFORE, for and in consideration of the mutual promises and obligations set forth herein, the parties agree as follows:

1.  <u>Terms of Employment.</u>

    (a)  During the term of this Agreement, Mr. Ronsen shall serve on a full-time basis as President of NMRX's Orbit One division (the "Division"), with such powers and responsibilities as are customarily incident to such position and will diligently and competently perform such reasonable duties in connection with the Division's business as may be assigned to him by NMRX's Chief Executive Officer. Mr. Ronsen will report to NMRX's Chief Executive Officer, and, from time to time as reasonably required by the business needs of the Division, to such other members of NMRX's senior management team as NMRX's Chief Executive Officer directs. Notwithstanding Mr. Ronsen's full-time service commitment to the Division, Mr. Ronsen may, from time to time, devote business time and attention to his "Bridger Fire" business; provided however, that Mr. Ronsen is not permitted to devote more than two work days per month to "Bridger Fire."

    (b)  During the term of this Agreement, NMRX shall pay Mr. Ronsen an annual base salary ("Base Salary") (less appropriate withholding and deductions, as required by income tax, FICA and other applicable law) for all services to be rendered by Mr. Ronsen in the amount of $235,000, payable semi-monthly in accordance with NMRX's customary payroll practice. The Base Salary may be increased from time to time by NMRX pursuant to NMRX's normal performance review policies for management.

    (c)  In addition to the Base Salary, Mr. Ronsen shall receive those fringe benefits normally available to full-time management employees of NMRX in accordance with NMRX's established policies. Mr. Ronsen shall be credited with his prior service to OOC, Inc. for all benefit plans and arrangements which measure eligibility or benefits by length of service.

(d)    During the term of this Agreement, Mr. Ronsen will be eligible to receive an annual cash bonus of up to 40% of Base Salary upon the achievement of NMRX company-wide EBITDA and revenue objective determined by NMRX's board of directors (or compensation committee thereof) annually under NMRX's executive bonus plan. In addition, during the term of this Agreement, Mr. Ronsen shall be eligible to receive an annual bonus in the targeted amount of $50,000 based on his "Management Business Objectives (MBOs)" as determined annually by NMRX's Chief Executive Officer based on financial goals set by NMRX's board of directors (or compensation committee thereof).

(e)    During the term of this Agreement, Mr. Ronsen shall be entitled paid vacation and personal days for each full calendar year in accordance with NMRX's established policies for full time management employees. Mr. Ronsen shall also be entitled to all paid holidays given by NMRX to its management employees.

(f)    During the term of this Agreement, Mr. Ronsen shall be entitled to receive reimbursement for all reasonable expenses incurred by him (in accordance with the policies and procedures established from time to time by NMRX) in performing services hereunder, provided that Mr. Ronsen properly accounts therefor in accordance with NMRX policy.

(g)    Mr. Ronsen's employment relationship with NMRX is at-will. At either Mr. Ronsen's option or NMRX 's option, Mr. Ronsen's employment hereunder may be terminated at any time, with or without cause or notice, subject to the payment terms provided in this Agreement.

2.    For Cause Termination.

(a)    In the event of termination by NMRX of Mr. Ronsen for Cause under Sections 2(a)(i), (ii) or (iii) (as defined below), NMRX shall have no further obligations to Mr. Ronsen under this Agreement (but shall continue to have and fulfill its obligations to OOC, Inc. under the Asset Purchase Agreement) from and after such date of termination, except for amounts earned but unpaid prior to such termination and unreimbursed expenses, which shall be paid promptly. For purposes of this Agreement, a termination of employment is for "Cause" if: (i) Mr. Ronsen has been convicted of a felony; (ii) Mr. Ronsen materially breaches his obligations to NMRX under this Agreement, which breach continues for a period of thirty (30) days after written notice of demand to cure has been delivered to Mr. Ronsen, or is habitually and grossly negligent in the performance of his duties hereunder; (iii) Mr. Ronsen fails substantially to follow or perform the lawful and reasonable directives of NMRX's Chief Executive Officer, which failure continues for a period of at least thirty (30) days after written notice of demand to cure has been delivered to Mr. Ronsen; (iv) commencing with the quarter ending June 2008, the Division fails to attain 65% of the Revenue Target or 50% of the EBITDA Target on a trailing twelve month basis measured quarterly as set forth on the Schedule A attached hereto and incorporated by reference herein, provided that any such termination must occur within sixty (60) days of such determination; or (v) if Mr. Ronsen is deceased.

(b)    In the event of termination of Mr. Ronsen by NMRX for Cause under Section 2(a)(iv) or 2(a)(v), NMRX shall pay Mr. Ronsen (or to his estate, as applicable) six (6) months salary as severance provided Mr. Ronsen (or his estate, as applicable) executes NMRX's standard

release agreement, the form of which shall be reasonably acceptable to Mr. Ronsen, which shall provide for the release of NMRX, and its affiliates, officers, directors, etc. from any legal claims Mr. Ronsen may have, including but not limited to claims for disputed wages or bonuses, wrongful discharge and discrimination, but excluding any claims related to his status as a shareholder of NMRX or OOC, Inc. Such severance shall be paid to Mr. Ronsen in six (6) equal, semi-monthly installments less applicable withholding, in accordance with NMRX's payroll practices.

(c)    In the event of a termination by NMRX of Mr. Ronsen for Cause, NMRX shall have the right notwithstanding anything to the contrary in Section 1.6 of the Asset Purchase Agreement, to manage the Division without regard to the Business Plan, so long as it does so in a commercially reasonable manner consistent with the exercise of good business judgment.

(d)    The Non-Competition Period (as defined in Section 5) for termination by NMRX for Cause under subsections (a)(i), (ii) or (iii) above shall end on the later to occur of (A) two (2) years following termination or (B) December 31, 2010. The Non-Competition Period (as defined in Section 5) for termination by NMRX for Cause under subsection (a)(iv) above shall end on the later to occur of (A) one (1) years following termination or (B) December 31, 2010.

(e)    In the event of a termination by NMRX of Mr. Ronsen for Cause pursuant to subsections (a)(iv) or (iv) above, NMRX shall continue to provide Mr. Ronsen (or, in the case of a termination on account of his death, his spouse or heirs, as applicable) with health and welfare benefits throughout the Non-Competition Period.

3.    <u>Termination Without Cause or For Good Reason.</u>

(a)    For purposes of this Agreement, "Good Reason" shall mean: (i) a material breach by NMRX of any of its obligations to Mr. Ronsen under this Agreement, which breach is not cured in all material respects within thirty (30) days (except in the case of a payment default for which the cure period shall be ten (10) days), in each case following written notice thereof from Mr. Ronsen to NMRX; or (ii) a material reduction of Mr. Ronsen's duties, authority or responsibilities such that (regardless of title) he no longer has the customary duties and authority of the president of the Division (including, without limitation, authority to spend the Division's operational budget and determine the direction of the Division's business within the confines of the Division's operational budget pursuant to NMRX's proceses and policies.

(b)    In the event of termination of Mr. Ronsen by NMRX without Cause or by Mr. Ronsen for Good Reason, NMRX shall pay Mr. Ronsen six (6) months salary as severance provided Mr. Ronsen executes NMRX's standard release agreement, , the form of which shall be reasonably acceptable to Mr. Ronsen, which shall provide for the release of NMRX, and its affiliates, officers, directors, etc. from any legal claims Mr. Ronsen may have, including but not limited to claims for disputed wages or bonuses, wrongful discharge and discrimination, but excluding any claims related to his status as a shareholder of NMRX or OOC, Inc. Such severance shall be paid to Mr. Ronsen in twelve (12) equal semi-monthly installments less applicable withholding, in accordance with NMRX's payroll practices. Companies shall also promptly pay Mr. Ronsen amounts earned but unpaid prior to such termination and unreimbursed expenses.

(c)    In addition to the compensation specified in (b) above, in the event of the termination of Mr. Ronsen by NMRX without Cause or by Mr. Ronsen for Good Reason, OOC, Inc. shall be deemed to have earned the NMRX Stock referenced in Section 1.3(a)(iv) and 1.3(a)(v) of the Asset Purchase Agreement as well as the cash consideration specified in Section 1.3(a)(vi) of the Asset Purchase Agreement and such NMRX Stock and cash will be distributed to OOC, Inc. on the measurement dates specified in the Asset Purchase Agreement (without any conditions other than the passage of time).

(d)    In the event that NMRX relocates the Division's headquarters away from OOC, Inc.'s present location in Bozeman, Montana, prior to December 31, 2009, or Mr. Ronsen is required to relocate from Bozeman, Montana such action shall constitute termination without Cause and Mr. Ronsen may elect to terminate employment for such reason and such reason shall be deemed to constitute a termination by NMRX without Cause.

(e)    The Non-Competition Period (as defined in Section 5) for termination by NMRX without Cause or by Mr. Ronsen for Good Reason shall be six (6) months.

(f)    In the event of a termination by NMRX of Mr. Ronsen without Cause, NMRX shall continue to provide Mr. Ronsen with health and welfare benefits throughout the Non-Competition Period.

4.    <u>Termination Not For Good Reason.</u>

(a)    In the event of a termination by Mr. Ronsen other than for Good Reason, NMRX shall have the right notwithstanding anything to the contrary in Section 1.6 of the Asset Purchase Agreement, to manage the Division without regard to the Business Plan, so long as it does so in a commercially reasonable manner consistent with the exercise of good business judgment.

(b)    In the event of a termination by Mr. Ronsen other than for Good Reason, the Non-Competition Period (as defined in Section 5) shall end on the later to occur of (A) one (1) years following termination or (B) December 31, 2010.

(c)    In the event of a termination by Mr. Ronsen other than for Good Reason, NMRX shall continue to provide Mr. Ronsen with health and welfare benefits throughout the Non-Competition Period.

5.    <u>Non-Competition.</u>

(a)    Mr. Ronsen hereby agrees that, during the term of his employment by NMRX and following the termination of his employment with NMRX, for the duration of the "Non Competition Period" he will not, directly or indirectly, in any way, whether as principal or as director, officer, employee, consultant, agent, partner or stockholder to another entity (other than by the ownership of a passive investment interest of not more than 5% in a company with publicly traded equity securities): (i) own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation or control of any business in which NMRX (or any affiliate or subsidiary of NMRX) was engaged during the one year immediately preceding such termination; (ii) for himself or another, interfere with, solicit or

4

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.


MR. DAVID RONSEN, in his
individual capacity as an employee


NUMEREX CORP.

By:
Name:
Title:

**3**

## Schedule 1.1(b)
## Excluded Assets

(1)    The building and land on and from which the Business operates, other than the leasehold interest referred to on Schedule 1.1(a)(iii)(1).

(2)    The satellite antenna and related equipment owned by Clear Channel Satellite Service Inc. affixed to the building referred to in paragraph (1) above.

(3)    Any inventory and receivables of the Business which have been completely written off by the Seller prior to the Closing.

(4)    Dumpsters located on the premises of the Business.

(5)    Certain scopes used by the Business on loan from a contract engineer.

(6)    Satellite telephone inventory of Seller and assets related thereto as of the Closing.

(7)    Cash excluded from current assets, if any, pursuant to the Adjusted Net Working Capital Test.

(8)    Accounts Receivable related to Excluded Assets as of the Closing.

(9)    The contracts listed below:

| No. | Title of Agreement | Parties | Date |
|---|---|---|---|
| 1. | Mutual Non-Disclosure Agreement | ORBCOMM Inc. and Seller | March 1, 2007 |
| 2. | Mutual Non-Disclosure Agreement | A.R.T. Response Team Inc. and Seller | August 31, 2006 |
| 3. | Non-Disclosure Agreement | ACG Systems Inc. and Seller | May 28, 2006 |
| 4. | Mutual Non-Disclosure Agreement | AeroAstro Inc. and Seller | July 10, 2005 |
| 5. | Mutual Non-Disclosure Agreement | AgCert Services USA and Seller | January 2, 2007 |
| 6. | Mutual Non-Disclosure Agreement | Airdesk LLC and Seller | June 27, 2006 |
| 7. | Mutual Non-Disclosure Agreement, | Airtel Wireless and Seller | November 28, 2006 |
| 8. | Mutual Non-Disclosure Agreement, | Animal Profiling International, Inc. and Seller | March 1, 2006 |
| 9. | Mutual Non-Disclosure Agreement | AnyDATA Corporation and Seller | January 5, 2006 |
| 10. | Mutual Non-Disclosure Agreement | Arma Technologies Limited and Seller | October 5, 2006 |

| No. | Title of Agreement | Parties | Date |
|---|---|---|---|
| 11. | Mutual Non-Disclosure Agreement, as amended | Axonn, L.L.C. and Seller | February 1, 2006 |
| 12. | Mutual Non-Disclosure Agreement | Bee Alert Technology, Inc. and Seller | June 23, 2006 |
| 13. | Mutual Non-Disclosure Agreement | Bennett International Group and Seller | April 27, 2005 |
| 14. | Confidentiality Agreement | Business Source, Kelly O'Conner and Seller | June 1, 2004, |
| 15. | Mutual Non-Disclosure Agreement | CUSA LLC and Seller | July 8, 2006 |
| 16. | Mutual Non-Disclosure Agreement, | ComanCo Equipment Corp. and Seller | January 12, 2007 |
| 17. | Mutual Non-Disclosure Agreement, | Comtech Mobile Datacom Corporation and Seller | as of October 18, 2006 |
| 18. | Mutual Non-Disclosure Agreement | Michael Conley and Seller | September 21, 2006 |
| 19. | Mutual Non-Disclosure Agreement | CSI-Radio and Seller | January 17, 2007 |
| 20. | Mutual Non-Disclosure Agreement | Dilupe B.V.B.A. and Seller | September 21, 2006 |
| 21. | Mutual Non-Disclosure Agreement, | DTM Consulting, Inc. and Seller | October 4, 2005 |
| 22. | Mutual Non-Disclosure Agreement, | EDO Industries, Inc. and Seller | December 20, 2006 |
| 23. | Mutual Confidentiality Agreement | eLabs Inc. and Seller | June 9, 2006 |
| 24. | Mutual Non-Disclosure Agreement, | eProvenance LLC and Seller | April 17, 2007 |
| 25. | Mutual Non-Disclosure Agreement, | Foster Fuels, Inc. and Seller | August 2, 2006 |
| 26. | Mutual Non-Disclosure Agreement, | GMC Guardian Mobility Corporation and Seller | November 30, 2004 |
| 27. | Mutual Non-Disclosure Agreement, | GeoDecisions, a division of Gannett Fleming, Inc. and Seller | June 28, 2006 |
| 28. | Mutual Non-Disclosure Agreement | GeoDecisions, a division of Gannett Fleming, Inc. and Seller | November 20, 2006 |
| 29. | Mutual Non-Disclosure Agreement | GEOTAB, Inc. and Seller | May 25, 2006 |
| 30. | Mutual Non-Disclosure Agreement | Gestalt, LLC and Seller | December 15, 2006 |
| 31. | Mutual Non-Disclosure Agreement | HRE, Inc. and Seller | December 19, 2006 |
| 32. | Mutual Non-Disclosure Agreement, | I Spy Design and Seller | March 24, 2006 |
| 33. | Non-Disclosure Agreement, | IAP Worldwide Services, Inc. and Seller | March 16, 2005 |
| 34. | Non-Disclosure Agreement, | Impeva Labs Inc. and Seller | May 18, 2006 |

| No. | Title of Agreement | Parties | Date |
|---|---|---|---|
| 35. | Mutual Non-Disclosure Agreement, | Infodev Electronic Designers International Inc. and Seller | March 6, 2007 |
| 36. | Non-Disclosure Agreement, | Intelsat General Corporation and Seller | December 12, 2006 |
| 37. | Non-Disclosure Agreement, | International Technologies Group, LLC and Seller | March 31, 2005 |
| 38. | Mutual Non-Disclosure Agreement | Iridium Satellite LLC and Seller | April 10, 2006 |
| 39. | Mutual Non-Disclosure Agreement, | Carlton Jennings and Seller | March 14, 2006 |
| 40. | Mutual Non-Disclosure Agreement, | KORE Wireless Inc. and Seller | May 5, 2006 |
| 41. | Mutual Non-Disclosure Agreement, | Lark Enterprises, Inc. and Seller | January 10, 2007 |
| 42. | Mutual Non-Disclosure Agreement, | Link Communications, Inc. and Seller | June 10, 2006 |
| 43. | Mutual Non-Disclosure Agreement, | Lipsey Mountain Spring Water and Seller | August 25, 2006 |
| 44. | Proprietary Information Agreement, | Lockheed Martin and Seller | November 7, 2006 |
| 45. | Mutual Nondisclosure Agreement, | Zeke Lunder and Seller | July 20, 2005 |
| 46. | Mutual Non-Disclosure Agreement, | M2M Connectivity Pty Ltd. and Seller | November 8, 2006 |
| 47. | Mutual Non-Disclosure Agreement, | Madison Marketing & Associates and Seller | December 19, 2006 |
| 48. | Mutual Non-Disclosure Agreement, | The Morey Corporation and Seller | October 18, 2006 |
| 49. | Mutual Non-Disclosure Agreement, | Motorola, Inc. and Seller | February 6, 2007, |
| 50. | Non-Disclosure Agreement, | NAVTEQ North America, LLC and Seller | February 15, 2007 |
| 51. | Mutual Non-Disclosure Agreement | New Water LLC and Seller | September 6, 2006 |
| 52. | Mutual Non-Disclosure Agreement, | Numerex/Airdesk, LLC and Seller | June 27, 2006 |
| 53. | Mutual Non-Disclosure Agreement, | John O'Donnell and Seller | September 6, 2006 |
| 54. | Mutual Non-Disclosure Agreement | ORBCOMM LLC and Seller | March 22, 2004 |
| 55. | Standard Confidentiality Agreement, | Robin Pair and Seller | May 6, 2004 |
| 56. | Confidentiality Agreement, | PCB Solutions, LLC and Seller | October 23, 2006 |
| 57. | Standard Confidentiality Agreement, | Stephen Perry and Seller | May 3, 2004 |
| 58. | Mutual Nondisclosure Agreement, | Peter Zalizniak and Seller | July 11, 2005 |

| No. | Title of Agreement | Parties | Date |
|---|---|---|---|
| 59. | Mutual Non-Disclosure Agreement, | Raysat and Seller | October 26, 2005 |
| 60. | Mutual Non-Disclosure Agreement, | REID Supply Chain Lab and Seller | May 3, 2007 |
| 61. | Mutual Non-Disclosure Agreement, | Reliant Manufacturing and Seller | February 15, 2007 |
| 62. | Confidentiality Agreement, | RICOH Corporation and Seller | July 11, 2006 |
| 63. | Mutual Confidential Disclosure Agreement, | Robertshaw Controls Company and Seller | September 21, 2006 |
| 64. | Mutual Non-Disclosure Agreement, | Rosum Corporation and Seller | April 3, 2007 |
| 65. | Mutual Non-Disclosure Agreement, | Salco Technologies, LLC and Seller | March 29, 2007 |
| 66. | Mutual Non-Disclosure Agreement, | Savi Technology, Inc. and Seller | July 24, 2006 |
| 67. | Non-Disclosure Agreement, | Science Applications International Corporation and Seller | August 16, 2006 |
| 68. | Confidentiality Agreement, | Silicon Mountain and Seller | October 24, 2006 |
| 69. | Mutual Non-Disclosure Agreement, | Simmons and Seller | April 20, 2007 |
| 70. | Proprietary Information Exchange Agreement, | Skybitz, Inc. and Seller | January 22, 2007 |
| 71. | Mutual Non-Disclosure Agreement, | Spatial Mapping Ltd. and Seller | January 29, 2007 |
| 72. | Mutual Non-Disclosure Agreement, | Storm Services, LLC and Seller (incomplete agreement) | November 27, 2006 |
| 73. | Nondisclosure Agreement, | Stratos Mobile Networks, Inc. and Seller | November 18, 2004 |
| 74. | Mutual Non-Disclosure Agreement, | Teletouch Communications, Inc. | January 23, 2006 |
| 75. | Mutual Non-Disclosure Agreement, | TKC Technology Solutions and Seller | May 3, 2007 |
| 76. | Mutual Non-Disclosure Agreement, | TracStar Systems, Inc. and Seller | July 27, 2005 |
| 77. | Mutual Non-Disclosure Agreement, | Trident Sensors Ltd. and Seller | February 7, 2007 |
| 78. | Mutual Non-Disclosure Agreement, | U.S. Tech | December 19, 2006 |
| 79. | Non-Disclosure Agreement, | u-Blox America, Inc. and Seller | April 9, 2007 |
| 80. | Mutual Non-Disclosure Agreement. | Axonn, L.L.C. and Seller | November 1, 2005. Addendum dated 2/9/06 provides that the NDA shall continue in effect. |
| 81. | Proprietary Information Agreement | Seller and the Boeing Company | December 8, 2006 |

| No. | Title of Agreement | Parties | Date |
|---|---|---|---|
| 82. | Standard Confidentiality Agreement | Tom Stoughton and Seller | February 20, 2007, |
| 83. | First Amendment to Globalstar Service Authorized Sales Agent Agreement dated April 5, 2004, | Globalstar USA, LLC and Seller | July 12, 2002 to. Original was dated December 1, 2000 |
| 84. | Product Distribution Agreement | Globalstar USA, LLC and Seller | July 6, 2004 |
| 85. | Consulting Agreement | DTM Consulting, Inc. and Seller | September 29, 2005 |
| 86. | Distributor and Resale Agreement | EMS Technologies Canada, Ltd. and Seller | January 31, 2006 |
| 87. | Distributor Agreement | Seller and Stratos Mobile Networks, Inc. and Stratos Communications, Inc. | May 18, 2005 |
| 88. | RSWC, Handheld Low Orbit Satellite Comm. Telephone Equip., Accessories and Service Contract, | Seller and the State of Tennessee | September 1, 2005 |
| 89. | Thuraya Satellite Services Agreement | FTMSC US, LLC and Seller | February 1, 2007, |
| 90. | Commercial Lease Agreement | Delphini, LLC and Seller re: 2485 Manley Road, Bozeman, Montana | January 1, 2007, |
| 91. | Retention of Crowell & Moring LLP | Crowell & Moring LLP and Seller | June 25, 2007 |
| 92. | Engagement Letter | Lowenstein Sandler, Attorneys at Law and Seller | April 25, 2007 |
| 93. | Mutual Non-Disclosure Agreement | Tim Gunther and Seller | December 21, 2006 |
| 94. | Reseller Agreement for Data | Globalstar USA, LLC and Seller | June 1, 2004 |
| 95. | Collaborative Development Agreement | Seller and AeroAstro Incorporated | November 14, 2006 |
| 96. | OrbiTrax Demonstration Agreement | Seller and Storm Services | November 27, 2006 |
| 97. | STX Supply Agreement | Seller and AeroAstro, Inc. | August 16, 2006 |
| 98. | Demonstration Agreement | Seller and GeoDecisions | April 26, 2007 |
| 99. | Demonstration Agreement | Seller and Kennith Bresnan (VAMC-NDMS) | April 25, 2007, |
| 100. | Solicitation/Contract/ Order for Commercial Items | Seller and FEMA | September 6, 2005 |
| 101. | Contingency Search Fee Policy Agreement | Seller and Management Recruiters of Boulder, Inc. | February 7, 2007, |
| 102. | IRRIS Integration Project Design Document | GeoDecisions and Seller | July 26, 2006 |
| 103. | Professional Services Statement of Work | Seller and NetSuite, Inc. | October 19, 2006 |
| 104. | Confidentiality Agreement | Seller and GE Asset Intelligence, LLC | May 15, 2007 |

| No. | Title of Agreement | Parties | Date |
|---|---|---|---|
| 105. | Termination of Globalstar USA, LLC Authorized Sales Agent Agreement | Globalstar USA, LLC and Seller | June 26, 2007 |
| 106. | Termination of Globalstar Service Reseller Agreement for Voice and Data, Agreement No.: GUSA-R-05-0122 | Globalstar USA, LLC and Seller | June 5, 2007 |
| 107. | Mutual Non-Disclosure Agreement | Seller and Granite Enterprises | May 22, 2007 |
| 108. | Outline of Services Provided | HJ & Associates and Seller | June 21, 2007 |
| 109. | Mutual Non-Disclosure Agreement | Seller and MET Laboratories | May 10, 2007 |
| 110. | Demonstration Agreement | Seller and eProvenance | April 18, 2007 |
| 111. | Iridium Satellite Services Agreement | FTMSC US, LLC and Seller | February 1, 2007 |

4

**EXHIBIT D1**

## INTELLECTUAL PROPERTY AND
## CONFIDENTIALITY AGREEMENT

This CONFIDENTIALITY AND NON-COMPETITION AGREEMENT (this "Agreement") is entered into as of July 31, 2007 by and between Numerex Corp. and its affiliates (collectively, the "Company"), and, David Ronsen a resident of Montana (the "Employee").

In consideration of the Employee's employment with the Company and the obligations set forth herein, the parties hereto hereby agree as follows:

1.     <u>Ownership of Material Information</u>.  All right, title and interest of every kind and nature whatsoever in and to discoveries, inventions, improvements, patents (and applications therefore), copyrights, ideas, processes, developments, know-how, creations, properties and any and all other proprietary rights arising from, developed during or in any way related to, the Employee's employment by the Company, whether developed by the Employee independently or jointly with others (collectively "Intellectual Property"), shall be and remain the exclusive property of the Company, and the Employee shall have no interest in any such Intellectual Property.  The Employee shall promptly disclose to the Company and hereby assigns and transfers to the Company all rights in and to any and all such Intellectual Property.  If the Company elects to seek patent or other protection with respect to any Intellectual Property, the Employee shall, at the Company's expense, take any and all actions reasonably requested by the Company to obtain such protection for the benefit of the Company and to fully vest in the Company and its successors and assigns full right and title to such Intellectual Property.  Upon the termination of the Employee's employment with the Company for any reason, the Employee shall return to the Company all tangible materials containing Intellectual Property of the Company, including all copies of or other documents of any nature relating to any Intellectual Property, in the possession or under the control of the Employee.

2.     <u>Confidentiality</u>.  The Employee shall not, during the term of this Agreement and for a period of three (3) years following termination of his employment with the Company (except in the case of trade secrets, as specified below), disclose to anyone any confidential information of any nature whatsoever concerning the business or affairs of the Company (or of any affiliate or subsidiary of the Company), including but not limited to lists of and records relating to customers, business plans, business negotiations, market information, financial or cost information, or scientific or technical information (whether of the Company or entrusted to the Company by a third party under a confidentiality agreement or mutual understanding) which the Employee shall have acquired or have had access to in the course of, or incident to, the performance of his duties or otherwise ("Confidential Information").  The Employee shall hold in strictest confidence, as a fiduciary, any and all such Confidential Information, and shall comply with all instructions of the Company for preservation of the confidentiality of all such Confidential Information.  In the event of a breach or threatened breach by the Employee of the provisions of this Section 2, the Company may be entitled to an injunction restraining the Employee from disclosing, in whole or in part, such Confidential Information or from rendering any services to any person, firm, corporation, association or other entity to whom such Confidential Information has been disclosed or is threatened to be disclosed.  Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to the Company for such breach or threatened breach, including the recovery of damages from the Employee or otherwise.  Nothing herein shall be construed as prohibiting the Employee from disclosing to

anyone any information which (a) is or which becomes available to the public (other than by reason of a violation of this Section 2), (b) was lawfully received by Employee from a third party having a right to disclose it to Employee, as shown by contemporaneous written records; (c) which is a matter of general business knowledge or experience, or (d) which is required to be disclosed pursuant to applicable law provided that Employee gives the Company prompt detailed notice of the legal requirement compelling disclosure to permit the Company to seek a protective order or other remedy to protect the Confidential Information.   Upon termination of employment with the Company, upon request, Employee shall immediately return all tangible materials containing Confidential Information to Company and shall not retain any copies or derivatives thereof.  Confidential Information that qualifies as a "trade secret" under applicable law shall be maintained as confidential for the period of time required under such law.

3.      Capacity; No Conflict.  The Employee represents and warrants to the Company that he is not now under any obligation, of a contractual nature or otherwise, to any person, firm, corporation, association or other entity that is inconsistent or in conflict with this Agreement or which would prevent, limit or impair in any way the performance by him of services to the Company in the course of his employment.

4.      Waivers and Amendments.  No act, delay, omission or course of dealing on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as, or be construed as, a waiver thereof or otherwise prejudice such party's rights, powers and remedies under this Agreement.  This Agreement may be amended only by a written instrument signed by the Employee and a duly authorized officer of the Company.

5.      Governing Law; Jurisdiction.  This Agreement shall be governed by and construed in accordance with the laws of the State Georgia, without regard to the choice of law provisions thereof.  The parties hereto consent to personal jurisdiction of any state or Federal court sitting in Cobb County, Georgia, in order to enforce the rights of the Company under this Agreement, and waive any objection that such forum is inconvenient.  Each party hereby consents to service of process in any such action by U.S. mail or other commercially reasonable means of receipted delivery.

6.      Successors and Assigns.  The rights and obligations contained herein shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns.

7.      Severability.  Each provision of this Agreement shall be considered severable and if for any reason any provision that is not essential to the effectuation of the basic purpose of the Agreement is determined to be invalid or contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement that are valid.

8.      Miscellaneous.  Headings contained in this Agreement are inserted for reference only and do not constitute a part of this Agreement.  As used herein, unless the context otherwise requires, the single shall include the plural and vice versa, words of any gender shall include words of any other gender, and "or" is used in the inclusive sense.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one Agreement binding on the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written

_____

David Ronsen

_____

Date

Numerex Corp.

_____

Stratton J. Nicolaides, Chairman and CEO

_____

Date

**5**



# Associate Handbook

**Version 05/2007**

all associates, and if violated, The Company will take disciplinary action, including termination of employment.

# Standards of Corporate Responsibilities

## Confidentiality, Non-Disclosure and Non-Competition Agreements

All Company associates are required to maintain strict confidentiality of all Company information including but not limited to all hardware and software used by the Company in the conduct of its business, intellectual property and other proprietary information. The use or disclosure of proprietary or other inside information about or relating to the Company acquired as a result of your employment by the Company other than in direct furtherance of the Company's business is strictly forbidden. Associates may not take for themselves or divert to others any business opportunity in which they believe or have reason to believe that the Company would be interested. All associates are required to sign a Confidentiality, Non-disclosure and Non-Solicitation Agreement. All associates involved in sales for the Company are required to sign a Non-Competition Agreement. These agreements do not otherwise change the associate's at-will employment status with the Company. Violation of this policy in any way will be subject to disciplinary action including termination.

## Intellectual Property and Proprietary Information Agreements

In light of the dynamic nature of our industry, it is the policy of the Company that all associates sign an agreement regarding Intellectual Property and Proprietary Information. This agreement does not otherwise change the associate's at-will employment status with the Company. Intellectual property includes but is not limited to inventions, discoveries, improvements, ideas, computer programs and related documentation as well as works of authorship. Primary examples of intellectual property are patents, copyrights and proprietary information (also referred to as confidential, private and trade secret information). Because the value of such information is easily lost through disclosure, both present and former associates have a special responsibility to protect such information over which they have control or to which they have been given access. Associates should report any observed violations of infringement of intellectual property rights to their supervisor, Human Resources, or the Executive Vice President of Operations.

## Outside Employment

Associates must obtain prior written approval from the Company before any outside employment or other work activity (including any consulting activities) is undertaken. Failure to obtain such prior approval will subject the associate to discipline including termination.

## Short & Long Term Disability

The Company provides additional resources for associates who qualify for short or long term disability. It is necessary that associates who become eligible for these programs meet with Human Resources to ensure that these benefits are appropriately documented. Human Resources will also coordinate the classifications of this leave as it relates to other types of leave that an associate may be eligible to receive.

# USE OF EMAIL AND INTERNET

E-mail and Internet access, including, but not limited to, facsimile machines, computers, electronic mail and voice mail, is to be used solely for Company or client business. The Company reserves the right to monitor for any purpose all communications and access usage via the Company or client computing systems. All communications, information or materials delivered via such resources must be transmitted, stored, and accessed in a manner that safeguards appropriate confidentiality. Associates may encrypt their e-mail and files only with software approved by the Company. The Company may require a copy of any key necessary to access encrypted e-mail messages or files, as well as a copy of any password used by any associate.

## Computers and Software

The Company has implemented the following policy governing the acquisition, installation and use of third party commercial computer programs (software) effective immediately. The Company has adopted this policy in order to minimize the risk that a computer virus could attack our networks, to control the ordering, installation, copying, and use of software and to ensure that no one infringes software copyrights or violates license agreements with any of the Company's software suppliers. All Company associates are expected to comply with both the letter and spirit of the procedures outlined below.

1. Discovery of Illegal Copies. Unauthorized or illegal use of commercial software will not be allowed on computers owned by or used upon Company premises and any and all copies of such software will be removed and/or destroyed.

2. Copying of Software. No person shall make any copy of any commercial software without the express permission of and under the supervision of the Information Systems Manager except to install an authorized copy of software on a hard disk or to back up authorized hard disk copies. All back up hard disk copies must be visibly designated as such.

3. Personal Software. No person shall utilize on Company computers or on computers used on Company's premises any software not owned by the Company unless that software shall have been registered with the Information Systems Manager.

4. Removal of Company Software. No person shall make any copy of software owned or licensed by the Company for personal or other use without the consent of the Information Systems Manager.

5. Questions. Any questions regarding the status or use of commercial software should be referred to the Information Systems Manager.

## *Electronic Communication and Information*

Because technology is changing rapidly, this policy does not attempt to list each and every element of the Company's policy on electronic information and communication usage. Rather, it is merely a reference tool, outlining the Company's philosophy and general principles and prohibitions to be applied when using Company-owned or provided equipment. If you have any doubts on a particular issue or use, check with management first. The Company has the right to modify and/or interpret this policy at any time in its sole discretion.

The telephone system, facsimile machines, voice mail system, electronic mail system (e-mail), computers, computer network system, the Internet, any other electronic communication system, and the equipment and data stored on these systems ("Numerex's Electronic Information and Communication Systems") are Company property and remain so at all times. All messages and transmissions composed, sent, stored or received on Numerex's Electronic Information and Communication Systems are and remain the exclusive property of the Company and are not to be considered private property of any associate. As Company property, all messages on Numerex's Electronic Information and Communications Systems are subject to disclosure to law enforcement or government officials, or to other parties through subpoena or its equivalent, as well as for other business purposes except as such communications may be subject to the attorney-client privilege, the work product doctrine or some other protection which is recognized by the law. It is important to understand that even those email communications intended to be read by internal staff only may eventually be accessed and read by clients, vendors, competitors, media sources or other unintended recipients.

All users of the Company's systems must comply with all software licenses, copyright and intellectual property laws, as well as all other state, federal or local laws. Because of the potential that the Electronic Information and Communications Systems of the Company may be subject to disclosure, the Electronic Information and Communications Systems of the Company are to be used primarily for business purposes. Although some computers in the office are owned by individuals, those individuals cannot expect privacy rights to extend to the use of Company-owned or provided equipment or supplies. From time to time, such as when an associate is ill, on vacation, a business trip or a leave of absence, when it is suspected that a regulation or policy is being violated, if it is suspected that Company property is being used improperly, or simply to monitor job performance or performance of the equipment or for other business or legal needs, a Company representative may gain access to your voice mail or e-mail messages, your computer files, or any other Company property. For these reasons, you should not expect messages left on your voice mail, e-mail or other communication device or those which you send to be private. In fact, you should consider this information accessible like any other shared business file.

Although associates have individual passwords, encryption keys or access codes to their voice mail, e-mail and computer network systems, communications created, stored, sent or retrieved on such systems are not confidential, as these systems are accessible at all times by the Company. Even when a communication is erased or deleted, it may still be stored and thus can be retrieved and reviewed if and when business purposes require the Company to review, audit, intercept, monitor, access, print and disclose all messages created, received, stored or sent over Numerex's Electronic Information and Communication Systems, with or without notice.

Everyone is restricted from using passwords or access codes of other associates to gain access to another associate's e-mail, voice mail, or other stored communication without prior approval from the other associate or from management. Except where necessary for business purposes and where prior approval has been obtained, associates are prohibited from "hacking" into other systems or "cracking" other passwords or access codes. No electronic communication may be created, transmitted or stored which attempts to hide the true identity of the creator or sender.

Everyone is prohibited from using Numerex's Electronic Information and Communication Systems in any way that may be deemed illegal, fraudulent, or a violation of the Company's policy, as stated in this Handbook, concerning offensive conduct and harassment. Users encountering or receiving such material should immediately report the incident to management. Use of the Company's information and communication systems in violation of a Company policy, or that will damage the reputation of the Company is prohibited.

Users may not install software into any Company owned computers or the network without first receiving prior approval from management. Everyone is prohibited from disclosing any proprietary or confidential information of the Company without first receiving approval from appropriate members of management. When authorized, associates are expected to exercise significant caution when transmitting proprietary and confidential information over an electronic communication system because of the abilities of others to "crack" the system. Any such message containing proprietary and confidential information should begin with a warning declaring that such information is confidential and proprietary to the Company.

Inappropriate use of Numerex's Electronic Information and Communication Systems will subject any individual who has engaged in such inappropriate use to sanctions as deemed appropriate by management. Associates who violate this policy may be subject to disciplinary action including discharge.

This policy includes Company locations and client locations at which any associate may be working.

Please refer to APPENDIX A- for the Electronic Information Protection Policy in its entirety.

# APPENDIX A- Electronic Information Protection Policy
## NUMEREX CORP. AND SUBSIDIARIES

## Electronic Information Protection Policy

The purpose of this document is to set forth the general policy of the Company with respect to usage of Company electronic information assets so that all who use them will have a clear understanding of their individual responsibilities.

SCOPE

The policy applies to all users of our Company's electronic information assets, including employees, independent contractors, temporary workers, business and trading partners and all other entities using those assets.

COMPLIANCE

Compliance with this policy is required to adequately protect the Company's information assets. As such, any failure to comply with this policy could result in disciplinary or administrative actions, including, where appropriate, employment termination and legal recourse.

THE POLICY

I.    INFORMATION PROTECTION

1.    NumereX's intellectual property, informational and data as well as the intellectual property, information and data of its customers and partners are corporate assets. As such they will be protected from deliberate, unintentional or unauthorized alteration, destruction and inappropriate disclosure and are to be used only in accordance with established Company policy, standards and all applicable laws and regulations in the countries in which NumereX and its affiliates operate.

2.    All employees, associates and affiliates of NumereX are responsible and accountable for the protection of these assets.

II.    USE OF ELECTRONIC INFORMATION RESOURCES

1.    The company's electronic information resources, including all information systems, computer, word processing and communications facilities, e-mail and voice mail systems, accounts with on-line services and access mechanisms for those services and for the Internet as a whole, are provided at Company

expense, are the property of the Company and are to be used only for the purpose of conducting its business or other Company approved uses.

2.    Anyone who uses any of these resources through connections to the Company's communications networks consents to compliance with the provisions of this policy.

3.    All information processed on or through these resources is to be treated as Company property.    The confidentiality of sensitive information, including intellectual property or proprietary data, human resources information, information subject to attorney-client or other legal privilege is to be securely maintained.    All users have a duty to maintain, protect and respect the confidentially of such sensitive information.

Company confidential or proprietary information should not be transmitted without taking reasonable measures to protect its confidentiality and integrity.

**Users, when transmitting extremely sensitive information, should understand that there may be risks associated with the use of e-mail altogether or of using Company-approved encryption techniques. The Company cannot guarantee that internal e-mail messages will not be forwarded to recipients over the Internet, nor can it guarantee that interception of messages will not occur (e.g. "hacking") on internal or external networks.**

**Moreover, contents of e-mail or voice mail or other electronic messages must not include any statements that may imply contractual obligation, unless all normal steps for reviewing hard copy contractual documents are followed.**

4.    The highest level of care and professionalism must be used in preparing any communications through the use of Company electronic resources, including e-mail or voice mail communications as well as in other communications. It must be remembered that electronic communications, including e-mail or voice mail messages may be subject to disclosure pursuant to legal proceedings (e.g., subpoenas, and interrogatories). Moreover, e-mail, facsimile, voice mail and other electronic information resources are not to be used in a way disruptive or offensive to others, or otherwise harmful to the working environment. In addition, electronic information resources are not to be used for communications that may constitute trade disparagement of the Company, its customers, vendors, competitors or other parties.

5.    Each user will cooperate with the Company's efforts to control and protect access to Company information assets through the use of procedures for access to networks, applications, e-mail or voice mail approved by the Corporate or Division Information Security Director. Each department should ensure that its users employ passwords that comply with Company guidelines for access to all resources. Access privileges should be granted only on a business need basis and then only with the level of access needed to perform the job.

6.      Some electronic communications sent, received or stored are confidential and privileged communications between Company employees and either its attorneys or outside attorneys. Information and communications that may be subject to legal privileges should be clearly identified as "Privileged and Confidential" to preserve the legal privilege. Such messages may be forwarded to others only upon authorization of the attorneys or responsible corporate officials who may be deemed to be the holder of any privilege or legal protection. The inadvertent or malicious transmission of any such confidential or protected communications or work product shall not be deemed to be a waiver by the Company or its counsel of any privileges which it may, by law, be entitled to assert.

7.      Users should follow the practice of deleting e-mail and voice mail messages as soon as possible (preferably on a daily or weekly basis). In any event they should be retained no longer than the period established in applicable guidelines. E-mail administrators will take appropriate steps to delete messages from users' in boxes, message logs and general folders which are stored on a server within the period specified in those guidelines. In a user wishes to retain a piece of e-mail, he or she should do so in compliance with guidelines for retention. Any individual or Company deletion practices may be required to be suspended during the pendency of certain litigation or governmental investigations.

8.      The Company's electronic information resources, including e-mail, facsimile, voicemail and bulletin board services may be used to support educational, professional organization or community activities if approved by management. The resources may not be used, however, to solicit or proselytize for commercial ventures, religious, charitable or political causes, outside organizations, or other non-job-related solicitations. These resources must not be used to advocate, further or otherwise support any non-Company business activities or illegal activities.

9.      Users should make no attempt to gain access to the e-mail, voice mail or files of other users except as authorized by paragraph 10-b of this policy. Users must not test, or attempt to compromise computer or communication system security ensures. Incidents involving unapproved system cracking (hacking), password cracking (guessing), file decryption, bootleg software copying, or similar unauthorized attempts to compromise security measures may be unlawful, and will be considered violations of Company policy. Likewise, short-cuts bypassing systems security measures, as well as pranks and practical jokes involving the compromise of systems security measures are absolutely prohibited. Exceptions to this policy may be made by senior management for purpose of conducting tests of system security.

10.     Because e-mail, voice mail and other electronic information resources are to be used for company business and are the property of the Company, users cannot expect that their e-mail and voice mail communications or any other electronically stored information will remain private. The Company reserves the right to monitor use of e-mail and voice mail communications or any other electronically stored information in order to ensure compliance with Company policies and legal requirements, including, but not limited to, those set forth below.

a.  Routine monitoring of e-mail traffic flow does occur, including who sends mail to whom, when the mail is sent, and the subject filed of the messages. Also, messages undeliverable because of incorrect e-mail addresses may be examined for manual routing. Such monitoring or examination may be made by technical personnel or supervisory staff, or other for system maintenance or operational purposes.

b.  Because electronic mail messages are the property of the Company, any stored messages or files may be reviewed by management for any purpose as for any other Company documents or records.

c.  The Company may be required to disclose e-mail, voice mail and other electronically stored information to third parties pursuant to legal proceedings or governmental investigations.

d.  When a user leaves the Company, management will be given access to his or her e-mail, voice mail and other electronically stored information.

Use of the Company's e-mail, voice mail and other electronic information resources constitutes the user's acknowledgement of and consent to the Company's right to conduct monitoring and disclosure as described above.

11.  Because information received via e-mail (e.g., file attachments), Internet access (e.g., downloads of files or application programs) or portable media (tapes, diskettes, RAM cards, etc.) may contain computer viruses, all such file attachments, programs and media must be checked for viruses prior to being opened or executed.

12.  Copyrights, trademarks and contractual agreements may prohibit the duplication of material without authorization. Users should not include published materials in e-mail or file transfers without proper authorization. All licenses and copyrights associated with electronic material must be adhered to, and copyright notices, as required, included in any use of such material.

**6**

# RECEIPT FOR ASSOCIATE HANDBOOK

I acknowledge that I have received a copy of the Numerex Corp. Associate Handbook. I understand that I am responsible for reading the policies and the practices described within it. I agree that if there is any policy or provision in the Handbook that I do not understand, I will seek clarification from my supervisor, the Human Resources Department, or a member of the executive management team. I understand that the Company and any subsidiary thereof is an "at will" employer and as such my employment with the Company or any subsidiary thereof is not for a fixed term or definite period and may be terminated at the will of either party, with or without cause, and without prior notice. No representative of the Company or any subsidiary thereof (except the President of Numerex Corp.) has the authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the above. In addition, I understand that this Handbook states the Company's policies and practices in effect on the date of publication. I understand that nothing contained in the Handbook may be construed as creating a promise of future benefits or a binding contract with the Company or any subsidiary thereof for benefits or for any other purpose. I also understand that these policies and procedures are continually evaluated and may be amended, modified or terminated at any time.

_____
Signature

_____DAVID RONSON_____        ____8/1/07____
Printed Name                                              Date

**7**



**Lowenstein**
**Sandler**
ATTORNEYS AT LAW

Matthew Savare
Associate
Tel  973 597 2598
Fax  973 597 2599
msavare@lowenstein.com

August 4, 2008

**VIA ELECTRONIC MAIL AND VIA FEDEX**

Kent A. Yalowitz, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, New York 10022-4690
Email: kent.yalowitz@aporter.com

Re:    **Orbit One Communications, Inc. and David Ronsen v. Numerex Corp.**
       **Civ. No. 08-0905 (LAK)**

Dear Kent:

As you know, we represent Plaintiffs Orbit One Communications, Inc. and David Ronsen, in the above-referenced action. I write in response to your letter dated July 24, 2008. I will address each point as outlined in your letter to me.

1.    **Lowenstein Documents.**  During our call on July 24th, I advised you that John McFerrin-Clancy was considering your request for Plaintiffs to produce documents out of Lowenstein's files, and that I had to confirm with him as to what our ultimate position would be. Having confirmed with John, it is Plaintiffs' position that any such search would be pointless, as any non-privileged documents that Plaintiffs would be obligated to produce from such a search are (i) documents on which a Numerex employee or counsel were copied, and/or (ii) documents that reside on Numerex's servers. In addition, Plaintiffs have endeavored to go through their files and will produce all responsive, non-privileged documents. Thus, searching Lowenstein's files would be duplicative—both in terms of documents already in Numerex's possession and documents that will be produced out of Plaintiffs' files—and unduly burdensome, as it will unnecessarily shift the costs of such a search and the creation of an attendant privilege log onto Plaintiffs. Accordingly, Plaintiffs will not produce documents out of Lowenstein's files.

2.    **Letter of Intent.**  This confirms that Plaintiffs will produce non-privileged documents responsive to Requests 8, 9, and 11.

3.    **Stratix.**  This confirms that in response to Requests 40, 41, and 42, Plaintiffs will produce all responsive, non-privileged documents created after August 1, 2007. In addition, for documents created prior to August 1, 2007, Plaintiffs will produce only those responsive, non-privileged documents directly related to the FEMA contract.

Lowenstein Sandler PC                                                                              www.lowenstein.com

Reply:   1251 Avenue of the Americas  New York, New York 10020  Tel 212 262 6700  Fax 212 262 7402
         65 Livingston Avenue  Roseland, New Jersey 07068  Tel 973 597 2500  Fax 973 597 2400

Kent A. Yalowitz, Esq.                                                    August 4, 2008
Page 2

4.    **Time-Frame**.    Given the breadth of Requests 30 and 31, it would be unduly burdensome for Plaintiffs to collect, review, process, and produce documents of this nature going back to 2004. Moreover, many of the documents responsive to these requests are already in the possession of Numerex, as Plaintiffs provided such documents following the acquisition. Accordingly, Plaintiffs will produce only those responsive, non-privileged documents created on or after January 1, 2007.

5.    **Bulk Collection of Orbit One Documents**.    We have conferred with our clients and learned the following:

        a.    In or around late November/early December 2007, our clients, in a good faith effort to protect the confidentiality and privilege of pre-acquisition communications between them and their counsel, removed from the Numerex exchange servers their Outlook files (*i.e.*, e-mails with attachments, contacts, and calendar items) that they reasonably believed were privileged. In an attempt to be as comprehensive as possible, our clients cast their nets fairly broadly, which resulted in the collection of documents that are not privileged. We are in receipt of the entire collection of documents, and will, as soon as possible, return to you the documents (in their native format) that are clearly not privileged. Over the course of the next few weeks, we will review the remaining documents and (i) log those documents that are indeed privileged, (ii) redact and produce those documents that can be redacted, and (iii) return to you (in native format) those documents that are not privileged.

        b.    In or around April 2008, our clients, again in a good faith effort to protect their privileged documents, made back-up copies of their own Outlook files. If you recall, at this point in time, Plaintiffs maintained that the privilege did not pass to Numerex with the sale of Orbit One's assets. Accordingly, it was perfectly reasonable for Plaintiffs to wish to review all of their documents—including post-acquisition documents—for privilege. As you know, Plaintiffs are no longer asserting privilege with respect to such post-acquisition documents. Accordingly, we shall, as directed by you, either return to you this entire collection of documents in their native format or destroy such collection. Because these documents are and have always been on Numerex's servers, it would duplicative and wasteful for Plaintiffs to produce the exact same documents back to Numerex.

6.    **GHG**.    With respect to the Galusha documents, Plaintiffs' position was articulated in our Letter Brief in Support of Plaintiffs' Motion to Quash the Galusha Subpoena, which was filed on July 25, 2008.

7.    **Retainer Agreement**.    We continue to maintain that the retainer letter is irrelevant, and stand by our objection. However, as we discussed during our call, Plaintiffs retained Lowenstein in connection with the acquisition on or about April 25, 2007. In early December 2007, the scope of this engagement changed, as Lowenstein's representation evolved into representing Plaintiffs in connection with the dispute with Numerex. This is perfectly congruent with Anthony Pergola's July 27, 2007 e-mail to Andy Ryan in which Anthony

**LOWENSTEIN
Sandler**
ATTORNEYS AT LAW

Kent A. Yalowitz, Esq.                                      August 4, 2008
Page 3

wrote: "as you know, we do not represent any of the individuals so we reserve their or personal counsel's comments until you get sign-off from each of them." First, Lowenstein does not, nor has it ever, represented Gary Naden or Scott Rosenzweig. Second, given David Ronsen's role and 84% ownership interest in Orbit One and the fact that his Severance and Non-Competition Agreement was inextricably intertwined with and expressly made part of the APA, Lowenstein has, for all intents and purposes, been representing David since April 25, 2007.

Very truly yours,

Matthew Savare

20543/2
08/04/08 9371363.3

cc:     Brandon Cowart, Esq. (via electronic mail)
        John McFerrin-Clancy, Esq.



**8**

# ARNOLD & PORTER LLP

**Kent A. Yalowitz**
Kent_Yalowitz@aporter.com

212.715.1113
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

August 5, 2008

**By Email**

John McFerrin-Clancy, Esq.
Lowenstein Sandler PC
1251 Avenue of the Americas
New York, NY 10220

> Re:   *Orbit One Communications, Inc. and David
> Ronsen v. Numerex Corp.* No. 08-cv-0905 (LAK)
>
> *Numerex Corp. v. Scott Rosenzweig, et al.*, No.
> 08-cv-6233 (LAK)

Dear John:

Today I returned to the office and received Matthew Savare's letter dated August 4, 2008. The August 4 letter states that David Ronsen removed and then deleted electronically stored data from Numerex's servers in November or December 2007. The letter further states that Ronsen again removed electronically stored data in April 2008 shortly before terminating his employment. He did so without Numerex's approval or even awareness of his actions. The information Ronsen took—information sold to Numerex as part of the Asset Purchase Agreement or acquired by Ronsen while acting as a Numerex executive—is property of Numerex. Ronsen's actions are a clear breach of his fiduciary duties to Numerex, are a breach of his employment agreement with Numerex, and constitute conversion. This disclosure further raises the possibility of evidence spoliation, violation of the Georgia and Montana Trade Secrets Acts, and possibly even obstruction of justice in that Ronsen appears to have taken these actions with litigation in mind.

On behalf of Numerex, we hereby demand that this information not be accessed, reviewed, copied, or manipulated in any manner, and that you return the data to me immediately. If you do not agree to do so by tomorrow we will seek court relief.

Finally, the August 4 letter raises questions regarding Lowenstein Sandler's involvement in Ronsen's illegal activities. We hereby demand that Lowenstein Sandler (and Ronsen) preserve all information related to Ronsen's removal of the data, and that you immediately advise us of the extent of Lowenstein Sandler's involvement.

# ARNOLD & PORTER LLP

John McFerrin-Clancy, Esq.
August 5, 2008
Page 2

     This letter shall not be deemed a waiver of any of Numerex's rights but rather is intended expressly to preserve all of its rights and remedies.

Sincerely

Kent A. Yalowitz

cc:    Andrew J. Ryan, Esq.
       Brandon H. Cowart

**9**

# ARNOLD & PORTER LLP

**Kent A. Yalowitz**
Kent_Yalowitz@aporter.com

212.715.1113
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

August 8, 2008

Matthew Savare
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068-1792

Re:     *Orbit One Communications, Inc. and David Ronsen v. Numerex Corp.*

Dear Matt:

Thank you for your letter of August 6. I write to follow up on our conversation of that day. As I explained to you in some detail in that conversation, the question of waiver of attorney-client privilege by virtue of the transfer of documents to Numerex on August 1, 2007 has been in the case from the outset. I promised, during those discussions, that we would not review the documents in issue until *after* we resolved the claim of privilege.

John wrote me a letter dated April 28, in which he argued that *even though* Orbit One sold the documents to Numerex, Orbit One's privilege was intact. The April 28 letter made no suggestion of any kind that Ronsen had surreptitiously removed documents from Numerex in the fall of 2007, while he was a fiduciary of Numerex.

We responded in a letter from Brandon Cowart dated May 16. We argued that the privilege had been waived and advised that we would consider ourselves free, starting May 30, to review the documents.

On May 29, John and I had a conversation before our conference call with Judge Francis. John followed that conversation with an e-mail on June 4 in which he confirmed the proposal "concerning the documents in Numerex' possession over which we assert a privilege," agreeing to waive claims of privilege and allow Numerex to use them in discovery. I accepted that proposal.

At no time before your letter of August 4 did we have any inkling that the documents that we *thought* were *still* in Numerex's possession had been removed by Ronsen. Now that we know that, we have a few questions:

    a.   When did Ronsen remove the documents from Numerex?

    b.   Who assisted Ronsen with the removal?

    c.   Did Ronsen or anyone else make copies of any such documents?

# ARNOLD & PORTER LLP

Matthew Savare
August 8, 2008
Page 2

    d.  When did Ronsen advise Lowenstein that he had removed the documents?

    e.  When did Ronsen provide the documents to Lowenstein?

    f.  Who has reviewed the documents?

    g.  Have any documents been deleted?

    h.  If so, when and by whom?

Obviously, this issue is of great urgency and importance to us.  Please respond as soon as possible.

Best regards,

Kent A. Yalowitz

cc:    Andrew J. Ryan
       Brandon H. Cowart

**10**

# ARNOLD & PORTER LLP

**Brandon Cowart**
Brandon.Cowart@aporter.com

212.715.1309
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

February 7, 2008

**By Facsimile & E-Mail**

John J.D. McFerrin-Clancy, Esq.
Lowenstein Sandler PC
1251 Avenue of the Americas
New York, NY 10220

Re:    *Orbit One Communications, Inc. and David Ronsen v. Numerex*
       *Corp.*, Civil Action No. 08-0905 (LAK) (S.D.N.Y.)

Dear John:

I write regarding your February 5, 2008 email concerning Numerex's back-up disks supporting the Bozeman office's computer server. On January 24, Mr. Ronsen's IT administrator, Chris Dingman, first gave Numerex the administrative passwords necessary to access the Orbit One server in connection with meeting Sarbanes-Oxley requirements across all Numerex subsidiaries. On January 27, Numerex notified Mr. Ronsen and Mr. Dingman that as a result of this litigation, it was Numerex's obligation to preserve the information contained on Numerex's and Numerex's subsidiaries' servers and instructed Mr. Dingman to take the back-up disc system out of rotation and substitute new discs for backing-up the system. On January 31, personnel from Numerex's IT department took physical possession of the back-up disks. That same day I discussed the issue of the back-up discs with you.

Data on the back-up disks was captured from a server owned by Numerex. We do not agree that communications among your law firm, Orbit One Communications, Inc. and/or David Ronsen appearing on the back-up disks are subject to the attorney-client privilege. Once ownership and control of the those files passed to Numerex, ownership and control of the privilege likewise passed. However, in an effort to cooperate on this discovery matter, we will agree to manage the back-up disks as follows.

- Numerex will allow a third party vendor to search the back-up tapes for communications among Lowenstein Sandler, Orbit One Communications, Inc and/or David Ronsen occurring before August 1, 2007, the date of the closing.

- This back-up disk data will remain under the vendor's control until its privilege status is resolved.

# ARNOLD & PORTER LLP

John J.D. McFerrin-Clancy, Esq.
February 7, 2008
Page 2

- Numerex will select a third-party vendor, subject to your reasonable approval, with the parties sharing the costs equally.

- You will provide domain names which, subject to our approval, the vendor will use to search the back-up disks.

To be clear, we do not agree to sequester communications among Lowenstein Sandler, Orbit One Communications, Inc. and/or David Ronsen occurring after Numerex acquired Orbit One's assets. During this time, Mr. Ronsen was and remains an executive employed by Numerex. Any communications to or from him through Numerex's servers is the property of Numerex and not subject to any attorney-client privilege asserted against Numerex.

We look forward to your response on these issues.

Sincerely,

*B Cowart*

Brandon Cowart

cc:    Kent Yalowitz

**11**



**"Savare, Matthew"**
**<MSavare@lowenstein.com>**

02/19/2008 02:49 PM

To  Brandon Cowart/Atty/NY/ArnoldAndPorter@APORTER

cc

bcc

Subject  RE: Orbit One v. Numerex

History:          ☑ This message has been forwarded.

Thanks, Brandon.


Matthew Savare
Associate
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
Tele:  973-597-2598
Fax:  973-597-2599
msavare@lowenstein.com
www.lowenstein.com

-----Original Message-----
From: Brandon_Cowart@aporter.com [mailto:Brandon_Cowart@aporter.com]
Sent: Tuesday, February 19, 2008 2:47 PM
To: Savare, Matthew
Subject: Orbit One v. Numerex

Matt,

Following up on your voicemail, the server data has been preserved.
Also, I confirm that we are not, nor are we planning, to review the
potentially privileged information identified in my letter to John
until the privilege issue is resolved.

Brandon




_____

Matt,

I received your message and will return your call either today or
tomorrow.  I am in and out of the office on personal matters.

Brandon



------------------------------------------------------------------
This communication may contain information that is legally privileged,
confidential or exempt from disclosure.  If you are not the intended
recipient, please note that any dissemination, distribution, or
copying
of this communication is strictly prohibited.  Anyone who receives
this
message in error should notify the sender immediately by telephone or
by return e-mail and delete it from his or her computer.
------------------------------------------------------------------

**12**



"McFerrin-Clancy, John J.D."
<JMcFerrin-Clancy@lowenst
ein.com>

02/05/2008 04:34 PM

To  "Brandon_Cowart@aporter.com"
    <Brandon_Cowart@aporter.com>

cc

bcc

Subject  Orbit One v. Numerex

History:    This message has been forwarded.

Brandon:

I am responding to your proposal that the parties jointly hire a consultant to copy and otherwise preserve the electronic documents stored on the servers etc. in Bozeman. With regard to the servers, our view is that they belong to Numerex, and Numerex should take the steps necessary to preserve/review etc. these documents, as required by the rules. As I told you in our phone conversations, if Numerex needs assistance to access the servers, Mr. Ronsen, as its employee, will provide what he has, as I imagine will the other former Orbit One Inc. employees.

A more complicated issue is the backup disks. The backup disks contain privileged communications between Orbit One Inc. and Mr. Ronsen and counsel. These include emails pre-merger. We do not believe that Arnold & Porter, or Numerex, should have access to these privileged documents. On the other hand, we believe that much of the data on the disks belongs to Numerex. In this regard, your proposal makes some sense to us.

We propose that the parties hire a consultant to remove from the backup disks all privileged communications (this should be relatively easy, by searching on a few domain names). The consultant can then keep a copy, to ensure that documents are preserved. He/she would also give us a copy, and, upon receiving your document requests, would log these documents on a privilege log. You could then, as in any action, challenge the designations, and have confidence that the documents were preserved.

The data on the back up disks, minus the privileged material, would be released directly to you, to handle in accordance with the rules.

As you suggested, we would be willing to share the costs of this undertaking.

Please give me your thoughts.

Regards,

JM-C

John J.D. McFerrin-Clancy
Member
Lowenstein Sandler PC
1251 Avenue of the Americas
New York, New York 10020
Tele: (646) 414-6914
Fax: (973) 422-6897
jmcferrin-clancy@lowenstein.com
www.lowenstein.com

Circular 230 Disclaimer: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used,

**13**



**"Savare, Matthew"**
**<MSavare@lowenstein.com>**

03/11/2008 07:25 PM

To  Brandon Cowart/Atty/NY/ArnoldAndPorter@APORTER

cc  "McFerrin-Clancy, John J.D."
     <JMcFerrin-Clancy@lowenstein.com>

bcc

Subject  RE: Orbit One v. Numerex

Brandon:

We have had the opportunity to discuss with our client your February 7, 2008 letter concerning treatment of the backup tapes.  We are in agreement with you that a third-party vendor should be selected mutually by Numerex and Plaintiffs, and that this vendor should take possession of and search the backup tapes.  We also agree that Plaintiffs and Numerex should split equally the costs associated with such third-party searches.

We propose that the third-party vendor segregate all communications of Orbit One Communications, Inc. and/or David Ronsen with Lowenstein Sandler and/or any other retained professionals.  Any such communications occurring before the closing date (August 1, 2007) shall be deemed presumptively privileged and be sent only to Lowenstein Sandler for review.  Communications that are indeed privileged will be logged; responsive communications that are not privileged will be produced to you.  Any such communications occurring after the closing date will not be deemed privileged and will be sent to you for review and production.

Please advise whether you are amenable to this proposed resolution.

Thank you,


Matthew Savare
Associate
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
Tele:  973-597-2598
Fax:  973-597-2599
msavare@lowenstein.com
www.lowenstein.com

-----Original Message-----
From: Brandon_Cowart@aporter.com [mailto:Brandon_Cowart@aporter.com]
Sent: Tuesday, February 19, 2008 2:47 PM
To: Savare, Matthew
Subject: Orbit One v. Numerex

Matt,

Following up on your voicemail, the server data has been preserved.  Also, I confirm that we are not, nor are we planning, to review the potentially privileged information identified in my letter to John until the privilege issue is resolved.

Brandon

**14**

# ARNOLD & PORTER LLP

**Kent A. Yalowitz**
Kent_Yalowitz@aporter.com

212.715.1113
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

April 1, 2008

## BY ELECTRONIC MAIL

John McFerrin-Clancy, Esq.
Lowenstein Sandler PC
1251 Avenue of the Americas
New York, NY  10220

Re:     *Orbit One Communications, Inc. and David
Ronsen v. Numerex Corp.* – Litigation Hold

Dear John:

Thank you for visiting with us on March 20.  I enclose a draft Rule 16 Scheduling Order formatted per Judge Kaplan's model order.  Let me know if it is acceptable to you.

Besides the dates listed in the Rule 16 order, we agreed on additional dates among ourselves to guide discovery:

- Rule 26(a)(1) disclosures will be made by April 30, 2008;

- First document requests will be served by May 15, 2008;

- Depositions will begin September 15, 2008;

- Close of fact discovery will be February 6, 2009.

Finally, we propose to manage the dispute over potentially privileged materials located on the Orbit One server and back-up tapes as follows:

- Emails and other data on the Orbit One server appearing on or after August 1, 2007 is not privileged;

- For pre-August 1, 2007 data, we have a disagreement.  To manage this disagreement, we agreed to have a third-party vendor search emails for communications between Lowenstein Sandler PC and David Ronsen.  You will select the vendor, so long as the vendor is reasonably acceptable to us.  You will pay the vendor.  You will identify to the vendor and to us the domain names which you believe indicate privileged information.  The

# ARNOLD & PORTER LLP

John McFerrin-Clancy, Esq.
April 1, 2008
Page 2

vendor will use these domain names to search the Numerex server. For data not flagged using your domain search names, the vendor will turn it to over to Numerex. The vendor will provide you a copy of the flagged data for review. After your review, you agree to provide us a privilege log of materials you believe are privileged and to produce to us the non-privileged and/or redacted materials. This pre-August 1 data will be stored by the vendor until its privileged status is resolved. This protocol would apply as well to data contained in the back-up disks to the Orbit One server though we agreed that this data is not reasonably accessible.

- We disagree over whether any privilege exists for the pre-August 1 data. We also disagree over whether any privilege attaches to communications between Lowenstein Sandler and David Ronsen acting in his personal capacity rather than as an executive of Orbit One Communications, Inc. Finally, we disagree over whether any privilege attaches to any communication disclosed to Thomas Stoughton, a financial advisor to Orbit One Communications, Inc. In an effort to resolve these disputes, you will send us a letter setting out an explanation of your position, citing authorities. We will then send you a letter setting out an explanation of our position, citing authorities. If we cannot agree after good-faith efforts, we will seek the early intervention of the Court.

Let me know if the above accurately describes the results of our meeting.

Sincerely,

Kent A. Yalowitz

**15**

# ARNOLD & PORTER LLP

**Kent A. Yalowitz**
Kent_Yalowitz@aporter.com

212.715.1113
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

April 16, 2008

John McFerrin-Clancy, Esq.
Lowenstein Sandler PC
1251 Avenue of the Americas
New York, NY 10220

Re:    *Orbit One Communications, Inc. and David*
       *Ronsen v. Numerex Corp.* – Litigation Hold

Dear John:

Following our March 27 meeting, I was under the impression that you were planning to send us a short letter laying out plaintiffs' position on (a) the waiver of Old Orbit One's privilege by the sale of all assets of Old Orbit One (including computer data containing otherwise privileged communications) to Numerex, and (b) the role of Tom Stoughton, whether plaintiffs intend to claim privilege for communications he was a party to, and the basis for such a claim.

If I am misremembering our conversation, just let me know and we will feel free to review all pre-closing e-mail of Old Orbit One. If I am remembering it right, let me know when you plan to send me your letter.

Best regards,

Kent A. Yalowitz

**16**



John J.D. McFerrin-Clancy
Member of the Firm

Tel 646 414 6910
Fax 973 422 6897

jmcferrin-clancy@lowenstein.com

April 28, 2008

**VIA ELECTRONIC MAIL AND VIA FEDEX**

Kent A. Yalowitz, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, New York 100022-4690
Email: kent.yalowitz@aporter.com

**Re:    Orbit One Communications, Inc., David Ronsen v. Numerex Corp.**

Dear Kent:

As you know, we represent Plaintiffs Orbit One Communications, Inc. and David Ronsen (collectively, "Orbit One"). Further to our discussions during our meet and confer on March 21st, we write to articulate our position with respect to Plaintiffs' privileged documents.

## FACTUAL BACKGROUND

We believe that the following facts are undisputed: (1) an attorney-client privilege existed between Orbit One and Lowenstein Sandler with respect to the negotiations, formulation, and execution of the asset purchase agreement by and between Orbit One and Orbit One Communications, LLC dated as of July 31, 2007 (the "APA"); (2) this privilege extended to communications made between Lowenstein Sandler attorneys and Ronsen; (3) certain of these communications involved legal advice; and (4) these communications were made in confidence. Thus, both sides agree that such communications are privileged.

During the merger negotiations, Orbit One retained an investment professional, Stoughton Venture Capital Management ("SVCM"), to advise it and Lowenstein Sandler attorneys on several important financial terms. A significant component of SVCM's engagement was to enable Lowenstein Sandler attorneys to understand Orbit One's situation in order better provide legal services.

Given SVCM's central role in the transaction and its relationship with Orbit One, SVCM functioned as an agent of Orbit One during the merger negotiations. Accordingly, we believe that for purposes of privilege designations, any communications or documents between and among Orbit One, SVCM, and/or Lowenstein Sandler are privileged. Our understanding is that Numerex contests this conclusion.

Lowenstein Sandler PC

www.lowenstein.com

Reply:    1251 Avenue of the Americas  New York, New York 10020  Tel 212 262 6700  Fax 212 262 7402
65 Livingston Avenue  Roseland, New Jersey 07068  Tel 973 597 2500  Fax 973 597 2400

Kent A. Yalowitz                                                April 28, 2008
Page 2

## ISSUES

Given these facts, the issues that require resolution are:

1.      Whether Orbit One's ownership of privilege passed to Numerex along with the transfer of assets pursuant to the APA; and

2.      Whether privilege attaches to communications and documents to or from SVCM.

As described below, it is our position that under the laws of New York, which govern this action, all privileged communications and documents between Lowenstein Sandler, Orbit One, and SVCM relating to the merger (as distinguished from communications regarding operational issues) did not transfer to Numerex and remain under the sole ownership and control of Orbit One.

## ORBIT ONE MAINTAINS OWNERSHIP AND CONTROL OF THE PRIVILEGE WITH RESPECT TO COMMUNICATIONS RELATING TO THE MERGER

As an initial analytical matter, the attorney-client communications at issue here must be separated into two categories: general business communications regarding Orbit One's operations and those relating to the merger negotiations and the APA.

Where, as here, there is a transfer of not only substantially all of the assets of an organization, but also continuation of the business, courts recognize that the new management must be able to assert (as well as waive) the attorney-client privilege with respect to the first category of communications, as a measure of operational control. Accordingly, Orbit One does not contest that the privilege for communications impacting the ongoing business of the post-acquisition entity, including pre-APA documents and communications, passed to Numerex upon execution of the APA.

However, under similar facts, the Court of Appeals of New York held that although the attorney-client privilege for communications concerning the seller's operations passed to the buyer upon consummation of the merger, the privilege relating to communications relating to the merger negotiations did not pass and remained under the sole ownership and control of the seller. *See Tekni-Plex, Inc. v. Meyner and Landis*, 89 N.Y.2d 123 (N.Y. 1996).

In *Tekni-Plex*, Tekni-Plex and its sole shareholder entered into a merger agreement with TP Acquisition Company ("Acquisition") pursuant to which Tekni-Plex conveyed all of its assets and was merged into Acquisition. Several months after the parties executed the merger agreement, Acquisition commenced an arbitration against the sole shareholder, alleging that he breached a representation and warranty that his company complied with environmental laws.



Kent A. Yalowitz                                                    April 28, 2008
Page 3

Acquisition moved for an order requiring Tekni-Plex's attorneys to send it all the files in their possession concerning their prior representation of Tekni-Plex. The trial court granted this order and the Appellate Division affirmed, reasoning that any privilege passed to Acquisition upon consummation of the merger. The Court of Appeals modified this order, holding that Tekni-Plex and not Acquisition held the sole authority to assert the attorney-client privilege with respect to any confidential communications between Tekni-Plex and its attorneys relating to the merger negotiations.

In so holding, the Court of Appeals emphasized that during the merger negotiations, Tekni-Plex and Acquisition were "joined in an adversarial relationship," thus precluding any transfer of the privilege:

> To allow [Acquisition] access to the confidences conveyed by the seller company to its counsel during the negotiations would . . . be the equivalent of turning over to the buyer all of the privileged communications of the seller concerning the very transaction at issue. . . . Indeed, to grant [Acquisition] control over the attorney-client privilege as to communications concerning the merger transaction would thwart, rather than promote, the purposes underlying the privilege.

*Id.* at 130, 138.

Courts applying New York law have followed the model of *Tekni-Plex* and distinguished between operational communications and those involving the merger negotiations. *See, e.g., Postorivo v. AG Paintball Holdings, Inc.*, No. 2991-VCP, 2008 De. Ch. LEXIS 17 (Del. Ch. February 7, 2008).

In *Postorivo*, the sellers transferred substantially all of their assets to the buyers pursuant to an asset purchase agreement. After plaintiff sellers filed an action against buyers for, *inter alia*, fraud, waste, and breach of contract, the parties sought a determination of which entity held the attorney-client privilege as to communications and documents regarding, among other things, the operation of the seller's business both before and after the agreement and the negotiations of the agreement. The parties ultimately agreed that the buyer held the privilege for communications impacting the ongoing business of the post-acquisition company. Although the buyers conceded that the sellers retained the privilege for communications regarding the negotiation of the agreement, related contracts, and the transaction in general, the buyers argued that the sellers waived the privilege for all communications and documents that remained on the computers and servers sold pursuant to the asset purchase agreement.



Kent A. Yalowitz                                                                    April 28, 2008
Page 4

The court rejected this argument, citing *Tekni-Plex*, emphasizing that:

> [Sellers] were in an adversarial relationship to [buyers] when the parties negotiated the APA. Consequently, the rights of [sellers] with regard to disputes arising from the APA are independent from, and adverse to, the rights of [buyers]. Moreover, no provision of the APA provides that [buyers] sold or transferred their respective privileges and rights concerning communications with counsel related to the APA or the negotiations associated with the Agreement.

*Id.* at *19.

Here, during the merger negotiations, the interests of Orbit One and Numerex were independent from and adverse to each other. Moreover, Orbit One had a reasonable expectation that its communications with counsel and its retained professional regarding the merger negotiations and the APA would remain privileged even after the transaction was complete. Indeed, the Bozeman servers and the back up disks on which these communications reside were never accessible to Numerex or linked with Numerex's servers or system. Finally, no provision in the APA contemplates a transfer of this privilege. Accordingly, the privilege of such documents never passed to Numerex.

## COMMUNICATIONS WITH SVCM ARE PRIVILEGED

It is the law of the Second Circuit that in certain circumstances, privilege extends to communications that involve persons assisting the lawyer in the rendition of legal services. The leading case is *United States v. Kovel*, 296 F.2d 918 (2d Cir 1961). In *Koval*, the Second Circuit held that a client's communications with an accountant were privileged where they were made for the purpose of enabling the attorney to provide more effective counsel. The Court, acknowledging that many attorneys require assistance from third party experts concerning complex matters such as accounting, held that the attorney-client privilege extends to confidential communications between the client and the third party when such communications were made for purposes of obtaining legal advice from the lawyer, rather than purely accounting advice from the accountant. The Court explained:

> Accounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases. Hence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not to destroy the privilege . . . . By the same token, if the lawyer has directed the client . . . to tell his story in



Kent A. Yalowitz
Page 5

April 28, 2008

> the first instance to an accountant . . . communications by the
> client reasonably related to that purpose ought fall within the
> privilege     . . . . What is vital to the privilege is that the
> communication be made in confidence for the purpose of
> obtaining legal advice from the lawyer. If what is sought is not
> legal advice but only accounting service . . . , or if the advice
> sought is the accountant's rather than the lawyer's, no privilege
> exists.

*Id.* at 922 (citations omitted).

Here, SVCM was retained to assist Lowenstein Sandler in understanding Orbit One's condition
and to translate complex financial data. Such assistance was instrumental in enabling
Lowenstein Sandler attorneys to provide the most effective representation to Orbit One.
Accordingly, any confidential communication between or among Orbit One, Lowenstein
Sandler, or SVCM that was made for the purpose of obtaining legal advice from an attorney,
should be regarded as privileged.

## PROPOSAL

In light of the foregoing, Orbit One reiterates its position that it alone holds the attorney-client
privilege for its communications with counsel and SVCM and documents created by SVCM or
Lowenstein Sandler relating to the merger negotiations or the APA. Accordingly, we propose
the following:

1.      We are in agreement with you that a third-party vendor should be selected mutually by
Numerex and Orbit One, and that this vendor should take possession of and search the backup
tapes. We also agree that Numerex and Orbit One should split equally the costs associated with
such third-party searches.

2.      The third-party vendor shall segregate and send to me all communications between
Orbit One, Lowenstein Sandler, and/or SVCM and all documents drafted by Lowenstein
Sandler or SVCM.

3.      Lowenstein Sandler shall review these communications and documents for privilege,
with the understanding that any confidential communications or documents relating to the
merger negotiations or the APA (regardless of date) shall be deemed privileged.
Communications or documents relating to Orbit One's operations (regardless of date) shall be
deemed not privileged.



Kent A. Yalowitz
Page 6

April 28, 2008

4.     Communications and documents that are responsive and privileged will be logged; responsive communications that are not privileged will be produced to you.

We look forward to your response.

Very truly yours,

John J.D. McFerrin-Clancy

20543/2
04/28/08 6020242.2

cc:     Brandon Cowart, Esq. (via electronic mail)
        Anthony Pergola, Esq.
        Matthew Savare, Esq.



**17**

# ARNOLD & PORTER LLP

**Brandon Cowart**
Brandon.Cowart@aporter.com

212.715.1309
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

May 16, 2008

**By Regular Mail & Email**

John McFerrin-Clancy, Esq.
Lowenstein Sandler PC
1251 Avenue of the Americas
New York, NY 10220

           Re:    *Orbit One Communications, Inc. and David*
                  *Ronsen v. Numerex Corp.* – Privilege Issues

Dear John:

      After reviewing your April 28 letter, we disagree that the communications you identified are privileged. The communications at issue – emails and other documents located in various files stored on Numerex's servers – raise four substantive privilege issues and a procedural one.

    1.    **Pre-Acquisition Communications Recorded in Files Sold and Delivered to Numerex**

      The first disagreement concerns communications between Old Orbit One and Lowenstein Sandler before August 1, 2007 that were recorded in files that Old Orbit One sold and delivered to Numerex pursuant to the Asset Purchase Agreement (the "APA"). As part of the acquisition, Old Orbit One sold to Numerex all of its computer hardware and server back-up disks. *See* APA § 1.1. Old Orbit One specifically included within this sale all information, records, and working files contained therein. *Id.* Since pre-August 1 communications reside on Numerex's Bozeman server and back-up disks, Old Orbit One necessarily sold and delivered this information to Numerex. In the APA, Old Orbit One did nothing to protect the confidentiality of such communications, and after August 1, Old Orbit One did not have control over the files. Instead, it delivered them to Numerex. Hence, even assuming that the Pre-Closing communications were privileged as you claim, this privilege has been waived to the extent that the files were sold and transferred to Numerex. *See, e.g., In re In-Store Advertising Sec. Litig.*, 163 F.R.D. 452, 458 (S.D.N.Y. 1995) ("where confidential attorney-client communications are transferred from a corporation selling assets to the corporation buying assets, the privilege is waived as to those communications"). In this regard, this case is different from *Techniplex*, on which you rely. In *Techniplex*, the documents at issue were segregated in the files of the law firm that had represented the seller. Therefore, there was no question of waiver.

# ARNOLD & PORTER LLP

John McFerrin-Clancy, Esq.
May 16, 2008
Page 2

**2.    Communications Created During Ronsen's Employment at Numerex**

We disagree that communications between Ronsen and Lowenstein Sandler – created on Numerex computers or transmitted through the Numerex email system – are privileged. On August 1, Numerex hired Ronsen. Under the Numerex Associate Handbook, any and all emails sent or received through Numerex's email system are the property of Numerex and are subject to monitoring by Numerex without notice to employees. The Associate Handbook also makes clear that all data stored on Numerex-owned computers is property of Numerex and that employees should form no expectation of privacy about this information. On August 1, Ronsen signed an acknowledgement that he received the Associate Handbook and was responsible for reading it. Under these circumstances, Ronsen had no reasonable expectation that anything received through Numerex's email system or stored on Numerex computers was confidential. *See United States v. Etkin*, 2008 WL 482281, at *4 (S.D.N.Y. Feb. 20, 2008) (stating that once on notice that employer may monitor and inspect computers at any time, employees have no reasonable expectation of privacy in the contents of their work computers). Thus, these post-August 1 communications between Ronsen and Lowenstein Sandler are not privileged. *See, e.g., Scott v. Beth Israel Medical Ctr.*, 847 N.Y.S.2d 436, 440-44 (Sup. Ct. N.Y. Co. 2007) (holding that emails between employee and attorney not privileged because employer policy of regulating employee emails negated any reasonable expectation of privacy).

**3.    Communications about the Severance Agreement**

You do not address a third category of communications – Ronsen's communications with Lowenstein Sandler regarding his Severance Agreement prior to the time he retained Lowenstein Sandler. The Severance Agreement sets forth terms for Ronsen's employment with Numerex. In a July 13 email to Numerex's counsel, Lowenstein Sandler disclaimed representing Ronsen in his individual capacity. Since there was no attorney-client relationship between Ronsen individually and Lowenstein Sandler, communications between Ronsen and Lowenstein Sandler about the Severance Agreement cannot be privileged. In this regard, it would be useful for you to identify the date on which Ronsen (as an individual) retained Lowenstein Sandler.

# ARNOLD & PORTER LLP

John McFerrin-Clancy, Esq.
May 16, 2008
Page 3

### 4.    Communications with Stoughton

Finally, you assert that the Old Orbit One – Lowenstein Sandler privilege includes communications with a consultant hired by Old Orbit One, Tom Stoughton (acting through his company, Stoughton Venture Capital Management). You claim that because Stoughton was hired to explain to Lowenstein Sandler Old Orbit One's financial condition and to translate complex financial data, communications with him are privileged. We do not believe that the facts bear this out. The attorney/client "privilege applies only to communications between lawyer and client." *United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995). The privilege is waived for "voluntarily disclosing the information contained in the documents to nonparties." *Strougo v. BEA Associates*, 199 F.R.D. 515, 522 (S.D.N.Y. 2001). It does not extend to include third-party financial advisors unless their "role is limited to helping a lawyer give effective advice by explaining financial concepts to the lawyer." *Export-Import Bank of the United States v. Asai Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005). As we understand the facts, Old Orbit One hired Stoughton to help Ronsen negotiate directly with Numerex executives over the letter of intent terms. Stoughton began providing this assistance to Old Orbit since at least March 2007, before Lowenstein Sandler's involvement in the acquisition. In fact, Schedule 3.29 of the APA calls for Stoughton to be paid as the "Seller's [Old Orbit One's] Broker." Given these facts, Stoughton is hardly a mere interpreter of communications between Old Orbit One and Lowenstein Sandler.

### 5.    Procedure to Address the Privilege Disagreement

Initially we proposed segregating potentially privileged data on Numerex's Bozeman server while its discoverability was determined. We did so to prevent this disagreement from slowing other discovery. After further researching the legal and factual issues, however, it appears clear to us that these communications are not privileged. Given that Judge Kaplan recently set a shortened discovery schedule, to expedite discovery, we expect to begin searching data on the Orbit One server on Friday, May 30. If, after reviewing the foregoing, you believe that any of the categories of information described above and *already in the possession of Numerex* are privileged,

# ARNOLD & PORTER LLP

John McFerrin-Clancy, Esq.
May 16, 2008
Page 4

you should move for a protective order before then. (If you do move for a protective order, we will work with you to maintain the status quo while the Court decides the dispute.)

Sincerely,

*B Cowart*

Brandon H. Cowart

cc:     Kent A. Yalowitz

**18**

·Brandon
Cowart/Atty/NY/ArnoldAndPor
ter
NY - 3412   212-715-1309
05/27/2008 10:16 AM

To   "McFerrin-Clancy, John J.D."
     <JMcFerrin-Clancy@lowenstein.com>, "Savare, Matthew"
     <MSavare@lowenstein.com>
cc   Kent Yalowitz/Atty/NY/ArnoldAndPorter@APORTER
bcc

Subject   Orbit One v. Numerex: Conference with Judge Francis

John and Matt:

I contacted chambers and asked that we speak with Judge Francis at 9:00 a.m. on Friday, 5/30.  We are required to call to chambers jointly; here is a conference call number we can use.

Also, we have not received your discovery requests.  When do you anticipate serving them?

Regards,

Brandon

**Conference Call Dial-In Info:**

Date:                                    5/19/08
Time:                                    3:00 (EST)
Host:                                    Brandon Cowart/Arnold & Porter
Dial-in #:                               1-866-802-1366

Participant Passcode:     71471121 then #

**19**

| | | |
|---|---|---|
| **Kent**<br>**Yalowitz/Atty/NY/ArnoldAndP**<br>**orter**<br>NY - 3310   212-715-1113<br>06/09/2008 06:10 PM | To<br>cc<br><br>bcc | "McFerrin-Clancy, John J.D."<br><JMcFerrin-Clancy@lowenstein.com><br>"Brandon_Cowart@aporter.com"<br><Brandon_Cowart@aporter.com>, "Savare, Matthew"<br><MSavare@lowenstein.com>, "Andrew J. Ryan" |

Subject   Re: Orbit One, et ano. v. Numerex

John:

Your proposal is fine with us.  We will review the documents in Numerex's possession without limitation of any kind.  We will use those documents however we see fit to use them in discovery, or at trial, or otherwise.  We agree that plaintiffs' decision not make a motion now to protect those documents will not be an evidential fact used against plaintiffs in the event of a future dispute about privilege or waiver. Rather, each side will be free argue for or against the existence of any privilege or for or against the existence of any waiver based on all other evidential facts available to them at that time.

Best,

Kent
"McFerrin-Clancy, John J.D." <JMcFerrin-Clancy@lowenstein.com>



| | | |
|---|---|---|
| **"McFerrin-Clancy, John J.D."**<br>**<JMcFerrin-Clancy@lowenst**<br>**ein.com>**<br><br>06/04/2008 12:34 PM | To<br><br><br>cc | "'Kent_Yalowitz@aporter.com'"<br><Kent_Yalowitz@aporter.com>,<br>"Brandon_Cowart@aporter.com"<br><Brandon_Cowart@aporter.com><br>"Savare, Matthew" <MSavare@lowenstein.com> |

Subject   Orbit One, et ano. v. Numerex

Kent:

I write to confirm the proposal I made prior to Friday's conference before Magistrate Judge Francis, concerning the documents in Numerex' possession over which we assert a privilege.  Plaintiffs will forego making a motion with regard to these documents, and allow you to use them in discovery (essentially as you would any other document), provided that defendant agree that the failure to make such a motion would not constitute any broader waiver (such as subject matter waiver) of any privilege or immunity from disclosure.

I look forward to hearing your thoughts.

JM-C

| | | | | |
|---|---|---|---|---|
| John | | J.D. | | McFerrin-Clancy |
| Member | | | | |
| Lowenstein | | Sandler | | PC |
| 1251 | Avenue | of | the | Americas |
| New | York, | New | York | 10020 |
| Tele: | | (646) | | 414-6914 |
| Fax: | | (973) | | 422-6897 |

jmcferrin-clancy@lowenstein.com
www.lowenstein.com

Circular 230 Disclaimer: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter(s) addressed herein.

This message contains confidential information, intended only for the person(s) named above, which may also be privileged. Any use, distribution, copying or disclosure by any other person is strictly prohibited. In such case, you should delete this message and kindly notify the sender via reply e-mail. Please advise immediately if you or your employer does not consent to Internet e-mail for messages of this kind.

**20**



**LOWENSTEIN SANDLER**

ATTORNEYS AT LAW

**Matthew Savare**
Associate

Tel 973 597 2598
Fax 973 597 2599

msavare@lowenstein.com

August 6, 2008

**VIA E-MAIL**

Kent A. Yalowitz, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, New York 10022-4690

Re:    **Orbit One Communications, Inc. and David Ronsen v. Numerex Corp.**
         **Civ. No. 08-0905 (LAK)**

Dear Kent:

As you know, we represent Plaintiffs Orbit One Communications, Inc. and David Ronsen, in the above-referenced action. We are in receipt of your letter from yesterday. John is on business travel until Monday, and he will respond when he returns. In the interim, I can assure you that no data has ever been manipulated, destroyed, or deleted. As noted in my August 4th letter to you, we shall immediately return to you all of the Outlook files copied from the Numerex servers in April 2008, which, as I noted, are and have always been on Numerex's servers. Regarding the Outlook files removed from the Numerex servers in November/December 2007, we shall return those files to you (after we extract the pre-acquisition files that are presumptively privileged (*i.e.*, have an attorney in the document)) as soon as possible. In all likelihood, this will take a few days. We can submit these files to you as a .pst file or as a Concordance load file. Please advise the format in which you would like the files. We are currently in the process of reviewing the presumptively-privileged documents, and will produce redacted documents, documents that ultimately turn out to be non-privileged, and Plaintiffs' privilege log in the coming weeks.

Needless to say, we dispute the contentions and insinuations in your letter, and reserve further comment until John returns from Europe.

Very truly yours,

Matthew Savare

Matthew Savare

cc:    John McFerrin-Clancy, Esq.
         Brandon Cowart, Esq. (via e-mail)
         Andrew J. Ryan, Esq. (via e-mail)

Lowenstein Sandler PC                                                                www.lowenstein.com

Reply:   1251 Avenue of the Americas  New York, New York 10020  Tel 212 262 6700  Fax 212 262 7402
            65 Livingston Avenue  Roseland, New Jersey 07068  Tel 973 597 2500  Fax 973 597 2400

**21**



**Lowenstein Sandler**
ATTORNEYS AT LAW

John J.D. McFerrin-Clancy
Member of the Firm
Tel  646 414 6910
Fax  973 422 6897
jmcferrin-clancy@lowenstein.com

August 13, 2008

**VIA ELECTRONIC MAIL AND VIA FEDEX**

Kent A. Yalowitz, Esq.
Arnold & Porter LLP
399 Park Avenue
New York, New York 10022-4690
Email: kent.yalowitz@aporter.com

Re:    Orbit One Communications, Inc. v. Numerex Corp.

Dear Kent:

I write in response to your letter of August 5, 2008 to me, and of August 8, 2008 to Matt Savare. In your letter, you contend that Mr. Ronsen's archiving of certain electronic documents -- which we have always stated belong to Plaintiffs, and copying of other documents relating to his employment -- is unlawful, even criminal. Your characterization is unfounded, and the handling of these files was entirely proper. Moreover, the tone of you August 5 letter is overheated, given that: (a) we revealed the existence of the documents in connection with our response to your document requests; and (b) Numerex has not suffered an iota of harm from the handling of the documents.

As Mr. Savare informed you, Mr. Ronsen, in or around November 2007, archived from the Orbit One servers pre-August 1, 2007 communications. None of these documents has been deleted. Contrary to your assertions, Mr. Ronsen had every right to remove these documents. As we have consistently stated, we believe that communications within Orbit One Communications, Inc. ("Orbit") and between Plaintiffs, their employees, and counsel concerning the acquisition were never sold to Numerex. They have always remained the property Plaintiffs.

Consistent with this position, Numerex never had access to any of these documents. As you may know, Numerex never had access to the Bozeman servers or back up disks. The information was always maintained secure by and for Plaintiffs. When Numerex announced it was going to make copies of the Obit servers, Mr. Ronsen, in order to protect Plaintiffs' data, removed it from the servers. Other than Plaintiffs, these documents have been reviewed only by counsel to determine the nature of the documents, and for a privilege review.

Lowenstein Sandler PC                                                      www.lowenstein.com

Reply:    1251 Avenue of the Americas  New York, New York 10020  Tel 212 262 6700  Fax 212 262 7402
          65 Livingston Avenue  Roseland, New Jersey 07068  Tel 973 597 2500  Fax 973 597 2400

Kent A. Yalowitz, Esq.                                   August 13, 2008
Page 2

It is our view that none of the pre-closing communications regarding the acquisition was sold to Numerex. However, we are, as Mr. Savare told you, willing to return to Numerex all of the non-privileged materials. We will produce a log of the privileged material that we retain.

We have also informed you that Mr. Ronsen copied his Outlook files in April, while he was still employed by Numerex. These files were not altered, manipulated, or destroyed; instead, they were merely copied. Again, this was proper. During his employment, Mr. Ronsen was subjected to constant harassment, including baseless allegations of wrongdoing, both directly and through innuendo. He was fully entitled to review documents pertaining to his employment and to those allegations. He was also entitled to copy them. Under the terms of the confidentiality agreement with Numerex, Mr. Ronsen's only obligation was to return them upon demand. He has done so. Other than a cursory review by counsel to ascertain that the files were not likely to include documents as to which Plaintiffs continue to assert a privilege, only Plaintiffs have had access to the documents. Mr. Savare turned over the copy to you, and neither Orbit nor Mr. Ronsen retained any copies.

In sum, no Numerex documents were "removed" from the server. The November documents at issue belong to Plaintiffs. To narrow our dispute, Plaintiffs will return the non-privileged documents and log the remainder. We understand you may seek to challenge that privilege. The April documents that were in Orbit's and Mr. Ronsen's possession have been provided to you. In each instance, there was no deletion of any document. The only persons other than Plaintiffs who reviewed the documents at all were counsel.

In light of these facts, we do not believe there was any breach of the confidentiality agreement.

Very truly yours,

John J.D. McFerrin-Clancy

20543/2
08/13/08 9545556.2

cc:    Brandon Cowart, Esq. (via electronic mail)
       Anthony Pergola, Esq.
       Matthew Savare, Esq.

